CHARLES RAY EDWARDS, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 7273

July 3, 1974                                    524 P.2d 328

*Morgan D. Harris,* Public Defender, *Brian L. Greenspun* and *Howard N. Ecker,* Deputy Public Defenders, Clark County, for Appellant.

*Robert List,* Attorney General, Carson City; *Roy A. Woofter,* District Attorney, *Charles L. Garner* and *Daniel M. Seaton,* Chief Appellate Deputies, Clark County, for Respondent.

## OPINION

By the Court, GUNDERSON, J.:

About dawn, July 8, 1972, Las Vegas police answering a silent alarm captured appellant on the roof of Roxy's Cleaners. Appellant was charged with burglary, and as an habitual criminal because he twice had been convicted of robbery. See: NRS 205.060 and 207.010. Although the jury found appellant guilty of burglary, no transcript existed to show he had counsel when sentenced for one of the prior robberies. Hence, our district court sentenced appellant for burglary without enhancement, to 5 years concurrently with a recent jail sentence for a gross misdemeanor. On appeal, appellant's prime contention, which we reject, is that the evidence was insufficient to sustain the jury's determination of guilt.

Officer O'Hair testified he and Officer Lee arrived at Roxy's within two minutes of a radio dispatch. Arriving some 5 seconds earlier, Officers Rose and Norberg covered the front or west side of the multi-business complex. O'Hair and Lee took the rear side to the east. In O'Hair's words: "As we pulled around in back and stopped, . . . I observed [appellant] come up from the roof line—he was below the roof line and he raised up. He turned and saw these officers and immediately turned and ran across the roof line west, towards the front of the business."

Lee testified that as he and O'Hair alighted from their vehicle, O'Hair announced seeing a man on the roof. As Lee climbed to the roof, he saw appellant near the roof's west edge and ordered him to stand still. Then, Lee "finished getting up on the roof and approached the subject and advised him that he was being placed under arrest for burglary." "Five to seven feet" from an open vent hole in the roof, he saw stacked clothing, later proved stolen from the cleaners. Lee gave a "Miranda warning" and directed appellant to climb down to O'Hair, whom Norberg had joined. Later, when one of the officers below told him a man named "Bruce" was in the cleaners, Lee climbed down through the vent hole and arrested James Bruce Bolden.

Norberg testified that while guarding the front (west) side with Rose, he heard a voice say someone was on the roof. Then, appellant appeared, and as Norberg testified: "We told him to halt. We told him to place his hands above his head and held him there until Officer Lee could get on the roof and restrain the suspect." Next, Norberg "went around the back of the building to assist Officer Lee and Officer O'Hair to bring the subject down from the roof." Thereafter, Norberg "[p]laced him in handcuffs and escorted him around to the front and placed him in the police vehicle where I had read him his Miranda rights." Thereupon, Norberg testified, appellant waived his right to silence, saying someone named "Bruce" was with him in the building.[1]

Rose testified to being with Norberg when appellant was stopped at the front of the building, and later when Norberg advised appellant of his rights. Rose also said he helped

---

[1] NORBERG: I asked him if he wished to waive these rights, and he nodded his head to me in affirmation and then I asked him if there was anyone else with him. PROSECUTOR: Did he respond to that question? DEFENSE COUNSEL: Your Honor, I object; no foundation. THE COURT: Objection overruled. PROSECUTOR: You may answer the question. NORBERG: He stated that there was someone else with

. impound clothing stacked on the roof "maybe five feet away from the hole."

Aside from Officer Adams, who photographed the scene, and unsuccessfully processed for fingerprints, the State's only other witness was Mrs. Jenkins, owner of Roxy's. She testified that when she locked the premises the night before, items later found on the roof were inside, and that she had not given Edwards or Bolden permission to enter. On cross-examination, she said the alarm which alerted the police was activated by an electric eye inside the premises, and on redirect examination, without objection, testified to a prior experience in which about ten minutes had been necessary for a police response.

Appellant contended he became a "victim of circumstances," upon climbing on the roof to warn Bolden he had been spotted and the police might be coming.[2] As witnesses, appellant's counsel called Bolden (who had pleaded guilty to the burglary), appellant's wife, one Thelma Banks, and finally appellant himself. Evidently, the jury chose not to believe them.

1. Because burglary is commonly committed in secret, often at night, it frequently must be proved by circumstantial evidence. People v. Naughton, 75 Cal.Rptr. 451, 455 (Cal. App. 1969); People v. Huber, 37 Cal.Rptr. 512, 514 (Cal. App. 1964); People v. Jordan, 22 Cal.Rptr. 731, 734 (Cal.App. 1962); People v. Nichols, 16 Cal.Rptr. 328, 330 (Cal.App. 1961). As the court instructed the jury, every person concerned in committing an offense, whether he directly commits the act constituting the offense, or aids or abets it, is a principal and liable as such. NRS 195.020; cf. People v. Jordan, cited above. Moreover, the test for sufficiency upon appellate review is not whether this court is convinced of the

him in the building, and I says "Who," and he says, "Bruce." I says, "Bruce what?" and he says, "I don't know his last name, but his name was Bruce." I informed Officer Lee on the roof and the rest of the people in the area. PROSECUTOR: Did you have any further discussion with the defendant at that time? NORBERG: No sir. PROSECUTOR: Did the defendant offer you any explanation of why he was on the roof? NORBERG: No, sir, he didn't say anything about that.

[2] Since we conclude evidence was ample to convict appellant of burglary as a principal, we need not consider that his own testimony arguably showed him at least an accessory within NRS 195.030(1), to wit: a person not standing in the relation of husband or wife, brother or sister, parent or grandparent, child or grandchild, who "[a]fter the commission of a felony harbors, conceals or aids such offender with intent that he may avoid or escape from arrest, trial, conviction or punishment, having knowledge that such offender has committed a felony or is liable to arrest." (Emphasis added.)

defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could be convinced to that certitude by evidence it had a right to accept. Crowe v. State, 84 Nev. 358, 441 P.2d 90 (1968). Accordingly, we must decide if the jury acted unreasonably in determining there was no reasonable doubt of appellant's guilt. In doing so, we must remember, as the jury was instructed: "A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and substantial, not mere possibility or speculation." NRS 175.211(1).

Judges possess no unique faculty for perceiving relationships, discerning contradictions, drawing inferences, and making measured judgments. Accordingly, by noting salient aspects of the evidence, which we believe combine to justify the jury's verdict, we do not suggest the record contains no further support.

First, police captured appellant, not on the ground, but on the roof of looted premises, near the loot and the point of forced entry—a place one not criminally involved was unlikely to be, and a place appellant had no right to be. Quite aside from inferences the jury might draw from these facts, a legal presumption exists that an unlawful act is done with unlawful intent. NRS 47.250(1).

Second, from testimony of three policemen, supported by a photograph, the jury could decide the loot was so far from the vent hole that Bolden could not merely have thrust himself up through the hole and stacked the clothing, as he testified.[3] Although appellant and Bolden both asserted the clothing was "next to the vent," the jury could properly believe the officers instead. Then, the jury could decide it would be unnatural for Bolden, working alone and in haste, to climb completely out

[3]PROSECUTOR: Would you please stand up and by your hands show the ladies and gentlemen of the jury where the top of the vent reached on you? BOLDEN: Approximately here (indicating); I had to raise myself up. PROSECUTOR: May the record indicate that Mr. Bolden has indicated just slightly below his armpits. THE COURT: The record may show. DEFENSE COUNSEL: It's closer to the bottom of

onto the roof to place the clothing where it was found—particularly since Bolden did not say he did so, and since no reason appears for a lone burglar to proceed thus. Hence, an inference would permissibly follow that appellant, the only person on the roof, had received and stacked the clothing, actively participating in the burglary with Bolden.

Third, that appellant attempted to flee when the police arrived is a circumstance supportive of an inference of guilt. McGuire v. State, 86 Nev. 262, 468 P.2d 12 (1970); Williams v. State, 85 Nev. 169, 451 P.2d 848 (1969).

Fourth, although appellant testified he attempted to dissuade Bolden from the burglary in question, he admittedly was with Bolden shortly before the crime, discussing its advisability. This court previously has held "[p]resence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred." Bayman v. Sheriff, 89 Nev. 86, 506 P.2d 1259 (1973); Johnstone v. Lamb, 89 Nev. 38, 505 P.2d 596 (1973); Robertson v. Sheriff, 85 Nev. 681, 462 P.2d 528 (1969). In this regard, it should particularly be noted that Officer Norberg testified appellant waived his right to silence, saying he was with a man named "Bruce" who was inside the premises, but falsely saying he did not know Bruce's last name.

Such facts, taken together, we think establish a *prima facie* case, which the testimony of appellant and his witnesses did not of necessity dispel. Appellant's justification for his presence on the roof required the jury to believe: (1) that appellant innocently learned Bolden was considering a burglary of Roxy's; (2) that appellant fortuitously discovered Bolden was proceeding with his unlawful purpose, by overhearing two men not produced as witnesses; and (3) that appellant improvidently and perhaps unnecessarily went onto the roof to warn Bolden he had been seen, although appellant recognized the police

---

the rib cage. THE COURT: Would you put a mark there again, please? BOLDEN: Approximately here (indicating). THE COURT: It's a little lower than the armpits; it's right across the top part of his diaphragm.

State's Exhibit 3 shows the vent hole, with its cover pried back, and two stacks of clothing, the nearest seemingly too far to have been placed there by a man with his chest thrust up through the vent hole to diaphragm height. The farther stack appears at least 6 feet from the hole.

might well be on the way. On every phase of this explanation, the testimony of appellant and his witnesses was inconsistent, fraught with inherent improbabilities, and contradicted in material respects by the police who testified.

First, for example, the explanation's initial phase suffered because Bolden said he did not discuss burglary prospects with appellant; whereas, appellant and his wife said burglary was discussed at Henry's Bar, next door to the crime scene, but differed on what was said. Appellant's wife said appellant opposed burglary of Roxy's as "penitentiary bait." Appellant did not claim to have opposed the burglary on legal or ethical grounds, but because it wasn't "worth it."

Second, regarding the explanation's next phase, i.e. how appellant learned Bolden had proceeded to the roof, the jury could find much to ponder. Appellant's wife testified that, after Bolden left Henry's Bar, two blacks she had seen there "on very many occasions" entered and said "the Bruce that just left out of here" was on the roof. The jury might be puzzled how two men arriving through the front door of Henry's would know that a man already on the roof of Roxy's had "just left out of here." Unlike his wife, appellant testified Bolden was identified by his last name.[4] The jury could well wonder about this contradiction, and also why appellant later told arresting officers he did not know that name. Moreover, since the two men who ostensibly spotted Bolden were supposedly habitues of Henry's, known on sight to appellant's wife, the jury had some evidentiary basis to believe that if appellant's explanation were true, he could have located and called them as disinterested, corroborating witnesses. As he did not, the jury might determine that the testimony of such men, if they existed, would not support appellant. Our law presumes that willfully suppressed testimony would be adverse. NRS 47.250(4).

Third, evidence concerning appellant's conduct after leaving Henry's also presented grist for the jury's intellectual inquiry. For example, as the prosecutor's cross-examination of appellant suggested, the jury might question why appellant had not adopted the simple and safe expedient of merely going out Henry's front door and calling up to Bolden, if indeed two men

---

[4]APPELLANT: Well, I just overheard this conversation, "Bruce Bolden, Bruce was on top of the building." DEFENSE COUNSEL: Did they say Bruce Bolden? APPELLANT: They said Bruce, and I said, "Bruce who?" And the guy said, "Bruce Bolden."

had told him Bolden was there.[5] Moreover, as mentioned, from the testimony of appellant's wife, it would seem that the two unidentified men who saw Bolden on the roof had seen him leave Henry's Bar as they approached. Both Bolden and appellant testified that they did not see one another that evening, other than in the bar, until after their arrest. Appellant and his wife testified he immediately left the bar to warn Bolden, as soon as the unidentified men entered and made their discovery known. Appellant said he went directly to the roof. For all of this to be true, the jury might notice that Bolden seemingly had the briefest span of time in which to force the vent open, climb down into the cleaners to select armloads of clothes, twice climb completely out onto the roof to stack the clothing there, and then climb back down into the cleaners a third time, before appellant could get to the roof. The jury could possibly decide that this sequence of events was intrinsically doubtful.

Without attempting to catalog all other testimony the jury may have considered, we note that appellant and Bolden acknowledged being "close associates." Each responded affirmatively when asked if he had previously been convicted of a felony. Appellant called a witness, Mrs. Thelma Banks, who testified he was standing in front of the cleaners when the police arrived.[6] Yet subsequently, when appellant testified, he acknowledged that he was apprehended on the roof, during an attempt to flee.[7]

In view of all this, we think that, after comparison and consideration of all the evidence, the jury could quite reasonably feel an abiding conviction of appellant's guilt, and thus decide the prosecution had met its burden of proof. Compare: Tellis

---

[5] PROSECUTOR: Why didn't you yell from the ground instead of going to the roof yourself? APPELLANT: I assumed he was off in the building. PROSECUTOR: How did you assume that he was in the building if they told you he was on the roof? APPELLANT: Because if he was thinking about burglarizing the place, he'd be going on the roof and not from inside. PROSECUTOR: Did anybody tell you that he was in the building? APPELLANT: No, they say he was on the roof.

[6] PROSECUTOR: Were you still in the area when the police came? MRS. BANKS: Yes. PROSECUTOR: How soon was that after you saw Charles [appellant] standing in front of the building? MRS. BANKS: Oh, it was about a minute, I guess, about a minute. PROSECUTOR: Was Charles still standing there when they came? MRS. BANKS: Yes. PROSECUTOR: Are you sure of that? MRS. BANKS: Yes.

[7] APPELLANT: So, as I go down, there was a police car there. PROSECUTOR: So what did you do? APPELLANT: So I went to the front, and when I went to the front, the officer down there pulled his pistol and he told me to hold it right there on the edge of the roof.

v. State, 85 Nev. 679, 462 P.2d 526 (1969). To hold otherwise would, we think, be to say that as a matter of law no participant in a burglary is ever subject to conviction so long as his accomplice supports his claim of innocence. Were we to adopt such a view here, then such a defense must also be honored as a matter of law, even if a defendant were captured inside looted premises. Manifestly, appellant's story would not, inherently, be significantly less plausible had he been captured inside, rather than while attempting to flee from the roof where entry was accomplished.

2. Appellant also contends the prosecutor improperly "commented" on appellant's exercise of his Fifth Amendment right to remain silent, by asking witnesses if appellant had explained his presence at the scene. As we previously noted, some "courts consider Miranda v. Arizona, 384 U.S. 436 (1966), to forbid reference to the fact that the privilege to remain silent was claimed in the face of custodial interrogation, and reverse without regard to the rule of harmless error." Shepp v. State, 87 Nev. 179, 181, 484 P.2d 563, 564 (1971). Nonetheless, we continue to believe, as we said in *Shepp,* that mere reference to such silence, without more, "does not mandate an automatic reversal," and that the "consequences should be governed by a consideration of the trial as a whole." 87 Nev. at 181, 484 P.2d at 564. For many reasons, some of which we mentioned in *Shepp,* we believe that in this case such references had no impact on the trial, and were therefore harmless.

3. Finally, appellant contends the district court improperly permitted the prosecutor to impeach appellant, by asking if he had previously been convicted of a felony. Nevada's Evidence Code, adopted in 1971, provides that with specified limitations, evidence of a felony conviction is admissible to attack a witness's credibility. NRS 50.095. Still, appellant urges that a trial judge has discretion to deny such impeachment, and that the court here erred by failing to exercise its discretion.

We agree that although our Evidence Code declares a prior felony conviction may be admitted for impeachment, the Code also contemplates that a court should exclude such evidence, if its probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury, NRS 48.035(1); or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence, NRS

48.035(2). Other courts applying similar provisions likewise recognize that, when timely called to do so by appropriate objection, a trial court should weigh such considerations. People v. Beagle, 492 P.2d 1 (Cal. 1972); Brown v. United States, 370 F.2d 242 (D.C.Cir. 1966); Luck v. United States, 348 F.2d 763 (D.C.Cir. 1965). If any declaration this court made before adoption of the Evidence Code may be read otherwise, it is disapproved.

Nonetheless, the Code also provides that error may not ordinarily be predicated upon a ruling admitting evidence, unless "a timely objection or motion to strike appears of record, stating the specific ground of objection." NRS 47.040(1)(a). Thus, if a defendant seeks to raise and preserve a claim that admitting a prior felony conviction for impeachment purposes would be outweighed by other considerations, he should bring such considerations to the trial court's attention, stating specific grounds of objection as our law requires. This was not done.

Here, no plain error affecting substantial rights appears. NRS 47.040(1). Upon review of the record, we think defense counsel competently represented appellant, proffering appropriate objections whenever any realistic prospect existed that the court might allow them.

Affirmed.

MOWBRAY, BATJER, and ZENOFF, JJ., concur.

THOMPSON, C. J., dissenting:

This court is requested to release Charles Ray Edwards from prison for the reason that his guilt of the offense of burglary was not proved beyond a reasonable doubt. The evidence against him was wholly circumstantial and the issue is whether the circumstances were sufficiently strong to exclude every reasonable hypothesis of innocence. I would hold that they were not of that character and, therefore, would reverse his conviction and order his immediate release from confinement. State v. Gray, 23 Nev. 301, 303, 46 P. 801 (1896); State v. Cerfoglio, 46 Nev. 332, 350, 213 P. 102 (1923); Roybal v. People, 496 P.2d 1019 (Colo. 1972).

At approximately 5:30 a.m. on July 8, 1972, police officers, in response to a silent burglar alarm, were dispatched to the premises of Roxy's Cleaners and Laundry in Las Vegas. Upon arrival, they saw Edwards on the roof of that establishment. One of the officers climbed onto the roof, noticed an open vent and a pile of clothing five to seven feet from the vent. Edwards was immediately arrested for burglary. His acquaintance,

James Bruce Bolden, was caught inside the building with money from the cash register in his possession. He also was arrested for burglary and subsequently pleaded guilty.

At the trial of Edwards, Bolden testified that he, Bolden, had entered the cleaners through the roof vent, and had placed the clothes on the roof himself. Edwards testified that shortly before the incident, and while drinking with his wife and Bolden at Henry's Bar, he had advised Bolden against "looking at" Roxy's. Nonetheless, he learned soon thereafter that Bolden was seen on the roof of Roxy's. Consequently he, Edwards, left the bar to get Bolden off the roof.

Dusting for fingerprints around the vent and cash register was not productive. Edwards was not seen to either enter or leave the building. He was not in actual possession of the clothes on the roof of the building or of any article belonging to the cleaning establishment or its customers. Cf. State v. Watkins, 11 Nev. 30, 37 (1876). Neither was there direct evidence that he aided or abetted Bolden in committing the burglary. NRS 195.020; State v. Logan, 59 Nev. 24, 31, 83 P.2d 1035 (1938); McWilliams v. State, 87 Nev. 302, 486 P.2d 481 (1971).

Edwards' presence on the roof of Roxy's near the pile of clothes along with his acquaintance with Bolden were, without question, highly suspicious circumstances. Yet, they do not prove beyond a reasonable doubt his entry into the building. Such proof is required as an essential element of burglary. NRS 205.060(1). Of course, circumstantial evidence may possess such strength as to establish entry beyond a reasonable doubt. State v. Watkins, supra (where the defendant was in actual possession of articles which could only have been obtained by entering the structure); Burkett v. State, 82 Nev. 383, 418 P.2d 991 (1966). That character of evidence does not appear in the record before us.

In 1923, this court wrote: ". . . there can be no conviction where the circumstances, though they create a strong suspicion of guilt, are as consistent with the theory of innocence as they are with the theory of guilt. In this case the State's testimony is consistent with the theory of guilt, but is also consistent with that of innocence. For the reason given, the verdict and judgment are reversed, and the trial court is directed to dismiss the case and discharge the defendant." State v. Cerfoglio, 46 Nev. 332, 350, 213 P. 102 (1923).

Proof that stands no higher than the level of suspicion, surmise or conjecture has insufficient substance to form the basis

for a conviction beyond a reasonable doubt. *Roybal v. People*, 496 P.2d 1019 (Colo. 1972).

Respectfully, I dissent.