JASON EVAN BROWNE, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 28378

February 26, 1997 933 P.2d 187

---

[7]The Honorable A. William Maupin, Justice, did not participate in the decision of this appeal.

*David M. Schieck,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney and *James Tufteland,* Chief Deputy District Attorney and *David Schwartz,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, Young, J.:

Appellant Jason Evan Browne ("Jason") was convicted of first degree murder for beating his wife, Chantelle Betty Elaine Browne ("Chantelle"), to death with a baseball bat. He was sentenced to death due to the aggravating factor of mutilation.

On appeal, Jason contends that certain statements made by the prosecutor during opening arguments constitute reversible error. He also alleges that certain hearsay statements were improperly admitted. In addition, he argues that the jury instructions on mutilation were constitutionally infirm. Lastly, he alleges that the

evidence was insufficient to support his conviction of first degree murder and the death sentence.

We conclude that Jason's contentions are without merit and, accordingly, affirm the conviction and sentence.

## FACTS

Jason and Chantelle were married in 1991. They each had children from prior relationships, and they had a baby together. All together, six children lived with the couple.

On November 5, 1993, the Browne family was visiting their next door neighbors, the Paynes. There, Jason had two to three bottles of beer. Around 6 p.m., the Browne family and the Payne children, Jeremy, Nichole, and Scottie, returned to the Browne residence where all the children were to spend the night. Around 9 p.m., Jason and Chantelle started arguing and fighting in their bedroom. At this time most of the children were in the living room, either sleeping or watching television. Shaun, Chantelle's nine-year-old son, heard his mother scream, "He's choking me!" She also yelled to Shaun to get Jason out of the house. Shaun opened the front door and told Jason to leave. Jason refused and Chantelle tried to run out the door. Jason blocked her way, slamming and locking the door to prevent her from leaving the house. Jason then dragged Chantelle by her arm along the hall-way floor back into their bedroom. Shaun and Jeremy, the ten-year-old neighbor, attempted to intervene by pulling Jason and Chantelle apart.

Shaun went into his bedroom and got a baseball bat for himself and then retrieved another bat from the backyard for Jeremy. The boys returned to the living room to watch television. At some point in the evening, Jason tried to hug Chantelle and urged her to go out with him. Chantelle refused and started hitting and screaming at Jason. Jason then suggested they go into the kitchen to talk; Chantelle agreed.

Shortly thereafter, at around midnight, Shaun heard his mother screaming from the kitchen, "Shaun, get him off of me. He's going to kill me." Shaun ran into the kitchen, bringing his bat, and saw Jason punching Chantelle in the stomach six or seven times with his fist. In order to protect his mother, Shaun swung the bat at Jason, but missed. Jason grabbed the bat and pushed Shaun in the chest until Shaun was forced to release it. Chantelle was sitting in a kitchen chair when Jason kicked her down to the floor and began hitting her about the face and head with the bat. Shaun yelled and Jeremy entered the kitchen.

Chantelle attempted to defend herself with her arms until Jason hit her with the bat in the ribs, and Chantelle's arms fell help-lessly to her sides. Jason paused and stated, "Now it's time to

call the police." Jason then continued to hit Chantelle with the bat as she lay limp on the floor. Jeremy's, Nichole's, and Scottie's testimony was consistent. Specifically, Jeremy testified that during the small portion of the beating that he observed, Jason hit Chantelle at least fifteen times. It is undetermined exactly how many times Jason hit Chantelle throughout the entire beating.

Jeremy unlocked the front door for Nichole, and most of the children ran out of the house to the Payne residence next door screaming, "He's killing her, he's killing her." Scottie testified that while observing the beating, at one point he noticed that Jason paused, looked at Chantelle, and then continued to beat her although she was not moving. Scottie was the last child to run out of the house.

As Shaun left the house, he looked behind and saw Jason leave the house, get into his car, and drive away. After the children arrived at the Payne house, Ms. Payne's boyfriend went to the Browne residence and saw a body lying in the kitchen. He recognized who the body was only by hair color. Otherwise, Chantelle was unrecognizable.

Officer Robert Tanner was dispatched to the crime scene. Upon arriving at the Browne house, he went to the kitchen to check Chantelle for any signs of life, but did not find any. He noticed blood splattered on the floor, ceiling, and walls of the kitchen. He also observed a baseball bat lying across Chantelle's body.

Officer Robert Mercer found Jason's parked car the next morning. However, Jason was not present. Approximately an hour later, Jason approached Officer Mercer and indicated that he was the individual the police were looking for. Jason had dried blood on his clothes and shoes.

Jason was arrested and indicted by the grand jury for first degree murder. The prosecutor sought the death penalty based on the aggravating circumstance of mutilation. Jason moved to strike this aggravator, and an evidentiary hearing was conducted. The district court upheld the aggravator.

At trial, Chantelle's father, Claude Goode ("Goode"), testified that within a few days before her death, Chantelle told him she planned on leaving Jason because she feared he was going to kill her. Goode also testified that in his opinion, they did not have a good marriage.

Dr. Robert Jordan, the medical examiner, performed the autopsy on Chantelle's body. He testified that Chantelle suffered significant trauma to her head. Her face was unrecognizable and had numerous lacerations and facial fractures. He stated the head was one large bruise due to the swelling and hemorrhaging into the underlying skin. In addition to the numerous defensive wounds on her arms, Chantelle had a "hinge fracture." This type

of fracture is the result of tremendous force applied to the top of the head, transmitting force down the sides of the skull along the thinner bones to the base of the skull. The fracture occurs at the base of the skull, rather than the top. She also had a severe laceration at the top of her head, exposing her skull, which is consistent with a hinge fracture.

Dr. Jordan testified that there were "no real life-like contours to the head." He could not state which particular blow actually caused death because Chantelle died of multiple blunt trauma due to an accumulation of blows to her head and face. Dr. Jordan further testified that Chantelle may have lived for three to five minutes after the trauma began. He stated that although he could not be certain, it was possible that post mortem injuries existed.

The jury found Jason guilty of first degree murder.

At the penalty hearing, the State presented evidence of Jason's prior acts of violence and domestic violence. Eight police officers testified to Jason's violent nature. Jason had cut a prior girlfriend's throat, held a loaded gun to Chantelle's head, beat up Chantelle on several occasions, attempted to run over Chantelle while her children were in the car, and violently resisted arrest.

Dr. Jordan further testified at the penalty hearing, explaining Chantelle's injuries and cause of death. He testified that the brain and face are essential parts of the human body. Chantelle's head and face suffered considerable destruction and "extensive mutilation." He defined mutilation as something which cannot be recognized for what it is supposed to be. Dr. Jordan testified that her injuries were a result of "overkill"; that is, Jason inflicted more trauma than necessary to cause death.

Jason's sister and brother also testified at the penalty hearing. The sister was not aware of any violence perpetrated by Jason on his prior girlfriends, other than when Jason once cut a girlfriend's throat. She was, however, aware of the violence to Chantelle. She stated that Chantelle was very erratic and jealous, but the couple had attended counseling to work out their problems. The sister believed they had a good marriage, despite the abuse. However, she was unaware that Chantelle filed for divorce and obtained restraining orders against Jason.

Jason's brother testified he was unaware that Jason was violent with Chantelle. However, he was aware of six or seven restraining orders that she had against Jason. He testified that Chantelle had a bad attitude, was argumentative, and was often the instigator of arguments.

The jury found that Chantelle was mutilated and recommended a sentence of death. The district court sentenced Jason to death, but granted a stay of execution pending this appeal.

## DISCUSSION

### 1. *Prosecutorial misconduct*

Jason argues that his conviction should be reversed because the prosecutor made allegedly improper comments during opening statements. Defense counsel objected to each comment, and the district judge sustained them. The judge and defense counsel admonished the jury that the prosecutor's opening statements are not evidence.

The allegedly improper comments were: (1) "What happened to Chantelle Browne in 1993, on November 5, 1993 was plain and simply a cold-blooded, premeditated murder, murder in the first degree"; (2) "[T]his trial is about a selfish and cruel man"; (3) Chantelle's home was "turned into a living hell that night"; and (4) "The evidence will show that this defendant made a decision to take a human life on November 6."

In Garner v. State, 78 Nev. 366, 371, 374 P.2d 525, 528 (1962), we held that during opening statements, a prosecutor can outline the theory of the case and propose facts he intends to prove, as long as he states the facts fairly.

We reviewed the statements Jason opposes and conclude that they do not amount to prosecutorial misconduct. To the contrary, the prosecutor was merely informing the jury that he intended to prove that the murder was premeditated. The only statement that could conceivably be considered improper was referring to Jason as "a selfish and cruel man"; however, we find that this comment did not rise to a level of misconduct requiring reversal. *See* Runningeagle v. State, 859 P.2d 169, 173-74 (Ariz. 1993) (holding the prosecutor's comment about the "evil" and "unspeakable horror" perpetrated by the defendant was merely characterizing the evidence); Benson v. State, 802 P.2d 330, 353-54 (Cal. 1990) (holding that the prosecutor's comment, "This crime is perhaps the most brutal, atrocious, heinous crime," was merely a comment on the nature of the offense and was permissible).

### 2. *Hearsay statements*

Jason argues that the district court committed reversible error by admitting two sets of hearsay statements. The first concerned Goode's opinion that his daughter had a bad marriage. Defense counsel objected to Goode's opinion of the marriage, because it was based on his conversations with Chantelle, rather than on his personal knowledge. The judge overruled the objection, ruling

that the present sense impression exception applied. *See* NRS 51.085.

The second set of hearsay statements concern a conversation Goode had with his daughter a few days prior to her death. Goode testified that Chantelle's voice was quivering and she sounded upset and despondent. She told him she planned on leaving Jason because she was afraid he was going to kill her. The judge overruled defense counsel's hearsay objection, ruling that the excited utterance exception applied. *See* NRS 51.095.

*Goode's opinion about the marriage*

Jason contends that the present sense impression exception is inapplicable because Chantelle told her father about the physical abuse on the phone, *after* any domestic violence incidents actually took place. The policy for admitting statements under this exception is that the statement is more trustworthy if made *contemporaneously* with the event described. Narciso v. State, 446 F. Supp. 252, 285 (E.D. Mich. 1977).

We agree with Jason that the present sense impression exception does not apply. The record does not indicate that Chantelle's statements to her father regarding the physical abuse occurred *at the same time* as the abuse itself. However, even if the district court gave the wrong reason for admission, no reversible error occurred if the statements were still admissible for another reason. Dearing v. State, 100 Nev. 590, 592, 691 P.2d 419, 421 (1984).

In Shults v. State, 96 Nev. 742, 747-48, 616 P.2d 388, 392 (1980), we held that out-of-court statements may be used as foundation for a non-hearsay purpose so long as the substance of those statements is not revealed to the jury. We also noted that the witnesses were subject to cross-examination as to the existence of the statements. Therefore, in *Shults,* we held the hearsay rule was not violated. *Id.*

In the present case, we note that the alleged hearsay statements were not offered to prove the truth of the matter asserted. Rather, the fact that Chantelle revealed certain information to her father was used solely as foundation for Goode's opinion regarding Chantelle's and Jason's marriage. We further conclude that Goode did not reveal the substance of Chantelle's statements and that defense counsel had ample opportunity to cross-examine him about these conversations. Accordingly, his opinion about Chantelle's marriage was not improperly admitted at trial.

Regardless, we conclude Goode's opinion, standing alone, did little to convince the jury that Jason committed first degree murder; therefore, any potential error was harmless. *See* Franco v. State, 109 Nev. 1229, 1237, 866 P.2d 247, 252 (1993) (holding that hearsay errors are subject to harmless error analysis).

*Chantelle's statements to Goode prior to her death*

The statements that Chantelle planned to leave Jason and that she was afraid Jason was going to kill her were admitted as an excited utterance. In Hogan v. State, 103 Nev. 21, 23, 732 P.2d 422, 423 (1987), we held that the victim's hearsay statements to two witnesses that her husband had threatened to kill her were admissible as an excited utterance. The victim made these statements right after the threat and an hour after the threat. Both times, the victim was frightened, shaky, nervous, and crying. We decided that since the victim was still excited even one hour later (and not only contemporaneously), *both* statements were admissible as an excited utterance.

Similarly, when Chantelle spoke with her father, she was upset, excited, and frightened. According to *Hogan,* even if Chantelle's statements were made an hour after a startling event, they may still be considered an excited utterance. However, the record here does not indicate the timing of the event precipitating her fear. Accordingly, as timing is often the determining factor for an excited utterance, these statements cannot fall into this exception.

Therefore, the district court improperly admitted the statements as an excited utterance. However, after a harmless error analysis, we conclude reversal of Jason's conviction is unnecessary. *See Franco,* 109 Nev. at 1237, 866 P.2d at 252.

### 3. *Admission of the photographs*

Jason argues that "gruesome" autopsy pictures of Chantelle were erroneously admitted at trial and at the penalty hearing because "the prejudicial effect of the photographs outweighed any possible probative value."[1]

---

[1] The standard for excluding evidence based on prejudice is: "Although relevant, evidence is not admissible if its probative value is *substantially* outweighed by the danger of unfair prejudice . . . ." NRS 48.035(1) (emphasis added). Jason never contends the probative value is *substantially* outweighed, merely that it is "outweighed." Consequently, even if Jason were correct, these pictures do not meet the statutory requirement for exclusion.

The State responds that the pictures were admitted to (1) show Chantelle's defensive wounds, (2) demonstrate the extent of her injuries, (3) prove mutilation at the penalty hearing, and (4) aid in Dr. Jordan's testimony.

We have repeatedly held that "[d]espite gruesomeness, photographic evidence has been held admissible when . . . utilized to show the cause of death and when it reflects the severity of wounds and the manner of their infliction." Theriault v. State, 92 Nev. 185, 193, 547 P.2d 668, 674 (1976) (citations omitted). Thus, gruesome photos will be admitted if they aid in ascertaining the truth. Scott v. State, 92 Nev. 552, 556, 554 P.2d 735, 738 (1976); Allen v. State, 91 Nev. 78, 82, 530 P.2d 1195, 1197-98 (1975).

In addition, the admission of photographs lies within the sound discretion of the district court. Absent an abuse of discretion, we will not reverse that admission. Domingues v. State, 112 Nev. 683, 695, 917 P.2d 1364, 1367 (1996); Redmen v. State, 108 Nev. 227, 231, 828 P.2d 395, 398 (1992); Benson, 802 P.2d at 348.

In Jason's case, the district court observed all the photographs that the prosecution wanted admitted as evidence and decided that the prejudice of some pictures substantially outweighed their probative value. Therefore, those photographs were excluded. However, the court found that the particular photographs at issue, which were admitted, were extremely probative, and the probative value was not substantially outweighed by prejudice. Consequently, we conclude that the judge did not abuse his discretion by admitting these photographs.

### 4. Sufficiency of the evidence in the guilt phase

Jason contends that the evidence presented at trial was enough to constitute only *second* degree murder because "the events happened upon a quick rage and [Jason] demonstrated remorse and confusion thereafter."

The test for sufficiency of the evidence upon appellate review "is not whether this court is convinced of the defendant's guilt beyond a reasonable doubt, but whether a jury, acting reasonably, could be convinced to that certitude by evidence it had a right to accept." Edwards v. State, 90 Nev. 255, 258-59, 524 P.2d 328, 331 (1974); see also Jackson v. Virginia, 443 U.S. 307, 318-19

(1979); Sanders v. State, 90 Nev. 433, 434, 529 P.2d 206, 207 (1974). Therefore, we must determine whether the jury acted unreasonably in assessing the evidence before them. *Edwards,* 90 Nev. at 258-59, 524 P.2d at 331.

Here, evidence which a jury could reasonably conclude amounted to premeditation consists of (1) Shaun's and Scottie's testimony that Jason stopped beating Chantelle, stated "Now it's time to call the police," and resumed the beating; (2) Shaun's and Nichole's testimony that shortly before the beating Chantelle screamed, "He's choking me" and "He's going to kill me"; (3) Scottie's testimony that during the beating, Jason paused, looked at Chantelle, and continued beating her despite the fact that she was not moving; and (4) Dr. Jordan's testimony regarding the extent of Chantelle's injuries.[2]

Accordingly, we conclude that the evidence is sufficient for *"any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

## 5. *Constitutionality of the mutilation aggravating factor*

Jason argues that the mutilation aggravating circumstance in NRS 200.033(8) is unconstitutionally vague and overbroad. He contends every murder involves mutilation under the definition that the district court gave to the jury.[3]

In Deutscher v. State, 95 Nev. 669, 677, 601 P.2d 407, 412 (1979), we held the mutilation aggravating factor is not vague because this court found the "legislative enactment [NRS 200.033(8)] to be plain and intelligible." *See also* Rogers v. State, 101 Nev. 457, 467, 705 P.2d 664, 671 (1985). We further held that since the district court defined the term "mutilate" for the jury, the aggravator passed constitutional muster. *Deutscher,* 95 Nev. at 677, 601 P.2d at 412.

Furthermore, the United States District Court for the District of Nevada and United States Court of Appeals for the Ninth

---

[2]DePasquale v. State, 106 Nev. 843, 848, 803 P.2d 218, 221 (1990), held that "[p]remeditation and deliberation can be inferred from the nature and extent of the injuries, coupled with repeated blows."

[3]Instruction 11 reads: "You are instructed that the term 'mutilate' means to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect."

Instruction 12 reads: "In order for mutilation to be found as an aggravating circumstance there must be mutilation of the victim beyond the act of killing."

Circuit have already specifically upheld as constitutional the same mutilation instruction, defining mutilation, used in Jason's case. Deutscher v. Whitley, 884 F.2d 1152, 1162 (9th Cir. 1989); Deutscher v. Whitley, 682 F. Supp. 1098, 1106 (D. Nev. 1988). Accordingly, we conclude that the instructions for the mutilation aggravator were not constitutionally infirm.

### 6. *Sufficiency of the evidence in the penalty phase*

Jason alleges that the State's evidence did not prove mutilation beyond a reasonable doubt. Mutilation requires an act beyond the act of killing itself. Jason states that since the cause of death was multiple blunt trauma, he did no act beyond that; therefore, no mutilation could exist. He further contends that if this court rules that multiple blows is sufficient to constitute mutilation, the consequences will be great. Jason alleges the ramifications of upholding his death sentence will be that a mutilation aggravator can be created for

> 1. Any case where there is more than one gunshot wound;
> 2. Any case where there is more than one stab wound;
> 3. Any blunt trauma case where there is more than the number of blows sufficient to cause death (irrespective of the knowledge, belief or intent of the perpetrator); and
> 4. Any case where there is injury to any part of the body other than the injury that caused death, i.e., make a limb imperfect.

We conclude that Jason exaggerates the State's position and the consequences of upholding Jason's sentence. This is not a case where there was simply "more than one" blow to the head. This case involves *well over fifteen severe blows*. Therefore, although Dr. Jordan could not ascertain exactly which blow killed Chantelle, he testified that any *one* of those blows could have caused Chantelle's death. Accordingly, due to the severity of the beating in its entirety, we hold that a jury could conclude that Jason committed acts beyond the killing itself.

Moreover, in Parker v. State, 109 Nev. 383, 394-95, 849 P.2d 1062, 1069-70 (1993), we affirmed a death sentence, holding that enough evidence existed for the jury to find, beyond a reasonable doubt, that the victim was mutilated. In *Parker,* the victim's brain and skull were crushed and destroyed when the defendant repeatedly hit the victim's head with a rock. The medical examiner testified to the extensive damage to the victim's head and that her brain was "an essential part of [the victim's] body." We noted

that even after the victim lost consciousness, the defendant continued to strike her with the rock, splattering blood on the walls, stove and countertops of the kitchen. *Id.*

Likewise, Dr. Jordan testified that Chantelle's brain was an essential part of her body, that her brain was completely destroyed, and that in his opinion this was "extensive mutilation" and "overkill." There was also evidence that even after Chantelle lost consciousness, Jason continued to hit her in the head with the bat. In addition, blood was splattered on the kitchen ceiling, walls, floor, cupboards, and door; one drop even made its way into the next room.

Jason contends *Parker* is distinguishable because the *Parker* victim's body was found with a knife plunged into her chest, ligatures around her neck, and evidence of sexual penetration after death. Jason argues these extra facts, taken together, constituted the mutilation in *Parker*. He contends since these extra facts are not present here, no mutilation was proven. However, we determined in *Parker* that these extra facts contributed to the depravity of mind aspect of the aggravator and not to the mutilation portion of the aggravator. *Parker,* 109 Nev. at 394-95, 849 P.2d at 1069-70.

We stated that "[t]he evidence presented at trial supports the jury's finding of *mutilation,* in that Parker 'permanently destroy[ed]' an essential part of [the victim's] body, her brain." *Id.* at 394, 849 P.2d at 1069 (emphasis added). We then explained the extent of damage to the victim's brain inflicted by *the beating*. As an additional factor, but not as a *determining* one, we noted the existence of the knife. Subsequently, as a *separate* issue, we discussed the other facts in the context of depravity of mind. *Id.* at 395, 849 P.2d at 1070.

Therefore, according to *Parker,* multiple blunt trauma which destroys the brain is sufficient for mutilation. After a thorough review of the record, we conclude that the evidence presented in Jason's case was sufficient for the jury to find mutilation based on the "overkill" nature of the baseball bat beating.

In cases in which the death penalty is imposed, this court is also statutorily required to consider whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor and whether the sentence of death is excessive considering both the crime and the defendant. NRS 177.055(2). We conclude that the death sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor, nor was it excessive in this case considering the senseless and violent nature of the crime and the defendant.

## CONCLUSION

We conclude that Jason's contentions do not present enough error, if any at all, to overturn his conviction or his death sentence. Consequently, we affirm the conviction and sentence.[4]

SHEARING, C. J., and ROSE, J., concur.

SPRINGER, J., dissenting:

I dissent to the penalty judgment because the aggravating circumstance "mutilation" is not defined in a manner that is constitutionally acceptable and because the incomplete and erroneous definition given by the trial court, even if correct, would not apply to the facts of this case.

The aggravating circumstance "mutilation of the victim," NRS 200.033(8), is not defined in the statute. The trial court defined this aggravating circumstance by giving two instructions. The first instruction defined "mutilate" in a manner approved by this court in Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979), thus:

> [T]he term "mutilate" means to cut off or permanently destroy a limb or essential part of the body, or to cut off or alter radically so as to make imperfect.

*Id.* at 677 n.5, 601 P.2d at 413 n.5.

The trial court did not stop with this definition, however, and went on to give this second, qualifying instruction to the jury:

> In order for mutilation to be found as an aggravating circumstance there must be mutilation of the victim beyond the act of killing.

The first instruction defines what is meant by mutilation; the second instruction imposes a qualifying limitation on the aggravating circumstance by requiring that the act of mutilating must "be . . . beyond the act of killing." I conclude that *in this case* the first, defining instruction is constitutionally insufficient and that the second, limiting or qualifying instruction, the beyond-the-act-of-killing instruction, is confusing, is unsupported by case authority, and creates an unreasonable and unnecessary impediment to the prosecution in proving this aggravating circumstance.

With respect to the defining instruction, the only part of the definition that is applicable to the present case is the following: "permanently destroy a[n] essential part of the body, or to . . . alter radically so as to make imperfect." (I have deleted the part of the definition referring to the cutting off or destroying of a

---

[4]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this appeal.

limb, because this part of the definition does not apply in this case.) In the case at hand, it is certainly arguable that there is evidence to support a jury finding that Browne permanently destroyed, made imperfect or radically altered an "essential part of the body" of his victim. (Although, I suppose, it could be argued that the face is not an "essential" part of the body and that one could live with an imperfect or radically altered face.) Defense counsel takes the position that even if it were conceded that Browne destroyed or altered "an essential part" of the victim's body, destruction or radical alteration of an essential part of the body accompanies every killing and every death. Consequently, argues the defense, the definition of mutilation as applied to this case fails entirely because it describes a condition that is present in *every* murder and does not, therefore, constitute an aggravating circumstance.

I agree with the defense argument. If we can agree on the meaning of "essential part of the body" (that is, I think, *indispensable* to the body, that which makes the body what it is), we can probably agree that a destroying, radically altering or making "imperfect" some essential part of the body was present in this case. If this, then, is to be our definition of mutilation, it has no "narrowing" effect and does not create a more culpable class of "death-deserving" murderers. I would submit that even if the jury concluded that Browne did destroy, radically alter or make imperfect an essential part of his victim's body, this would not, of itself, justify from a constitutional standard, the imposition of the death penalty.

With regard to the second, limiting or qualifying instruction, the beyond-the-act-of-killing instruction, I find a number of logical and legal defects. The first problem that I see with this limiting instruction is that it is incoherent. There is no relationship that I can see between mutilation and the phrase "beyond the act of killing." If as part of a killing the murderer *also* intentionally defaces, disfigures, dismembers or maims his victim, there is no point in making the unnecessary and disconnected inquiry as to whether the mutilation did or did not go "beyond the act of killing." The closest that I can come to understanding what it means for a murderer to go beyond the act of killing is that it means continuing to inflict injury upon the victim after he or she is dead. This is the way that defense counsel interpreted the phrase.

I see no reason for restricting mutilation to *post mortem* inquiry.[1] There is no logical basis for distinguishing between

---

[1] Defense counsel, during oral argument, expressed his belief that mutilation beyond the act of killing had to involve some *post-mortem* harm to the

beyond-the-act-of-killing mutilation and included-in-the-act-of-killing mutilation. Mutilation is mutilation and, in my view, is committed whenever a person kills intentionally with the added and accompanying intention of mutilating his victim irrespective of whether the mutilation was committed before or after the death of the victim.

To help in understanding the unnecessary narrowness of the beyond-the-act-of-killing limiting instruction, I would offer the example of a killing by a murderer who shot his victim with the intention of mutilating and obliterating his victim's face. The gun shot would kill the victim and would not be an act that went beyond the killing, thus, under the present instruction, freeing such a murderer from being found guilty of mutilation as an aggravator.[2] It seems rather obvious that there is a pressing need for formulating a new instruction on mutilation, an instruction that is not dependent upon the commission of an act which goes "beyond" the killing.

I would note further that the second, limiting instruction is unsupported by case law. The phrase, "beyond the act of killing" was first mentioned by this court in the case of Robins v. State, 106 Nev. 611, 629, 798 P.2d 558, 570 (1990), in a discussion of the need to eliminate "depravity of mind" as an aggravating circumstance. In connection with depravity of mind this court in *Robins* remarked that the United States Supreme Court in Maynard v. Cartwright, 486 U.S. 356 (1988), had "implied that torture or serious physical abuse could be a limiting and saving construction of an otherwise vague aggravating circumstance [*e.g.*, depravity of mind]." *Robins,* 106 Nev. at 629, 798 P.2d at 570. This court went on to "construe" NRS 200.033(8) "as requiring torture, mutilation or other serious and depraved physical abuse beyond the killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of

---

victim's body. I think it was reasonable for defense counsel to think that mutilation that was beyond the act of killing meant mutilation performed *after* the killing had been accomplished. In this case defense counsel argued that there was no evidence of *post-mortem* injury and that, therefore, the second, limiting instruction was not applicable in this case. There is no reason to limit mutilation to acts that are either after or "beyond" the killing. This problem is addressed in the definition of mutilation which I offer in this dissenting opinion.

[2]During the dialogue between the court and counsel for both prosecution and defense, during oral argument, the importance of *intent* to this aggravating circumstance became more and more apparent; and it appeared to me, and, I believe, to counsel that specific intent was an essential element of mutilation and must be included in any instruction relating to mutilation. I have included the element of intent in the instruction which I have offered in this dissenting opinion.

mind." *Robins,* 106 Nev. at 629, 798 P.2d at 570. All this language says to me is that NRS 200.033 is to survive constitutional challenge merely by deleting "depravity of mind" and leaving in effect torture and mutilation. It does not say that either torture or mutilation must be performed as an act that goes "beyond the act of killing"; and, as discussed above, such an added requirement makes no sense. There is no reason why torture and mutilation cannot be present in a murder without muddying up the definition with the phrase "beyond the act of killing." Torture is torture and mutilation is mutilation and can be performed either as part of the act of killing or "beyond" (whatever that means) the act of killing.

Unnecessarily and illogically adding the limiting beyond-the-act-of-killing factor to either torture or mutilation creates a nightmare for both prosecution and defense. The prosecution is faced with having to prove an almost impossible-to-prove and virtually unintelligible additional element when proving either torture or mutilation as an aggravating factor. The defense is faced with having to defend by bringing in evidence that certain acts were or were not "beyond" the act of killing, without having the vaguest idea of what it means to torture or mutilate "beyond the act of killing." Understandably, there is no explanation and no discussion of any kind in *Robins* as to the meaning of the phrase "depraved physical abuse beyond the act of killing itself"; and it is clear to me that this language arose only in the context of our trying to save NRS 200.033(8) from the "otherwise vague" depravity element of that statute and that it was not intended to create an added, limiting and qualifying definition of the mutilation or torture aggravator.

In Domingues v. State, 112 Nev. 683, 917 P.2d 1364 (1996), we considered the phrase "beyond the act of killing" in the context of the "torture" aggravator. In *Domingues,* we explained that in torture cases "the murderer must have *intended* to inflict pain beyond the killing itself." *Id.* at 702, 917 P.2d at 1377 (emphasis added). Thus, what distinguishes torture killings from other killings is the murderer's *intention* to do something more than to kill, an intention to do something "beyond the killing itself," namely, an intention to inflict pain upon the victim. In *Domingues,* we held that torture could not be present because the "evidence does not indicate that Domingues's *intent* was anything other than to kill the child." *Id.* (emphasis added). "There is no evidence that the *specific intent* behind the attempted electrocution or the stabbing was to inflict pain for pain's sake or for punishment or sadistic pleasure." *Id.* (emphasis added).

It is pretty clear to me that torture and mutilation fall into the same category and that, for a mutilation aggravator to stand, there

must be a "specific intent" to mutilate. The principal defect in the instruction given in this case is that the element of specific intent is missing. Rather than requiring the *act* of mutilation plus the *intent* to mutilate, the given instruction required the *act* of mutilation plus an *act* that could be described as going "beyond the act of killing." *Domingues* requires both act and intent for a finding of torture, *actus reus* and *mens rea*. The same principle should be applied to mutilation. In order for the aggravating factors of torture or mutilation to be present there must be the act of torture or mutilation *and* there must be "the specific intent . . . to inflict pain" (in the case of torture) or the specific intent to mutilate (in the case of mutilation). *Id.*

Once the necessity for dealing with specific intent as an element of torture and mutilation is understood, it is not difficult to come up with a working definition of the aggravating circumstance "mutilation of the victim."

The word mutilation comes from the Latin word *mutilus,* which means "maimed." The aggravating circumstance, mutilation, is closely related to maiming and to the crime, mayhem. "Mayhem consists of unlawfully depriving a human being of a member of his body, or disfiguring it or rendering it useless." NRS 200.280.[3] Mutilation as an aggravating circumstance amounts to murder plus mayhem, murder accompanied by *intentionally* "depriving a human being of a member of his body, or disfiguring it or rendering it useless."

If, as I propose, aggravating mutilation equals murder plus mayhem, it is not difficult to derive appropriate definitions to be provided to juries in mutilation cases. Consider the following:

> *Mutilation* means intentionally depriving a human being of a member of his body, or disfiguring or rendering it useless.
> *Mutilation of the victim,* as used in NRS 200.033(8), means mutilation of a murder victim. This aggravating circumstance is present when, at the time of the killing, in addition to having the intention to kill, the murderer has the added specific intention to mutilate and does in fact mutilate the murder victim.[4]

---

[3]The statute gives an inexhaustive list of examples of what it means to maim, viz., "cuts out or disables the tongue, puts out an eye, slits the nose, ear or lip, or disables any limb or member."

[4]We noted in *Domingues* that *torture* "involved a *calculated intent* to inflict pain" and that prosecutors ought "to be more discriminating in charging torture" unless they were able to provide proof of a calculated intent to inflict pain. In my judgment, prosecutors should not charge mutilation unless they are prepared to prove, in accordance with the instruction proposed in the text, that the murderer had a specific (calculated) intent to mutilate.

If the jury in this case had been instructed along the lines suggested in the above working definition of this aggravating circumstance, none of the issues raised by Browne would have their present force. Under the proposed definition of mutilation, or one like it, the jury would be faced with a decision as to whether it was Browne's intention during this beating to mutilate his victim's face. If the jury found (as well it could have) that Browne *intended* to "disfigure" the victim's face and that he carried out this intention "in addition" to his intention to kill her, then Browne would be guilty of mutilation, whether the wounds were inflicted *post mortem* or not and whether one of the successive "multiple blunt trauma[s]" was or was not "beyond the act of killing." The jury would have necessarily focused on Browne's intent and not on which blows were lethal and which were not.[5]

In sum, then:

1. This case must be reversed because (a) the definition of mutilation given to the jury describes acts that are present in every murder and therefore do not have the distinguishing characteristics that must accompany the definition of aggravating circumstances, and (b) the "beyond-the-act-of-killing" element of mutilation given to the jury was not proved beyond a reasonable doubt.

2. Any definition of mutilation as an aggravating factor must include the intent to mutilate as an essential element. The beyond-the-act-of-killing element that was given to the jury in this case must be abandoned as being unnecessary, illogical, unsupported by case authority and virtually impossible to prove.

3. The court should provide for use by the trial court a definition of mutilation that will be clear, understandable and constitutionally unobjectionable.

---

[5]Defense counsel pointed out during oral argument that under the definition of mutilation given by the court in this case Browne could have accomplished the same end (defacing his victim) merely by shooting her with a shotgun, point blank, in the face. Under these circumstances, the killing and the maiming would be accomplished in the performance of a single lethal act, and there could, therefore, be nothing "beyond the act of killing" upon which a finding of mutilation could be based. Under the definition which I propose, this would not be the case because the hypothetical shotgun assailant could very well be found to have had intentions beyond those of just killing his victim. If a murderer shoots a victim in the face with the intent to deface his victim and has this intention *in addition* to the intention of just killing the victim, the murderer could be found guilty of mutilation.