*1234
 
 OPINION
 

 Per Curiam:
 

 Ramon Franco (“Ramon”) and Valentino Rodriguez Franco (“Valentino”) (collectively “appellants”) were convicted after a jury found them each guilty of the first degree murder of Gilberto Echazabal (“Echazabal”). We conclude that the district court erred in admitting several hearsay statements made by Ramon’s wife, Kim. In addition, the prosecutor engaged in misconduct when it used a statement ostensibly admitted only against Valentino against Ramon, and in commenting upon the failure of Ramon’s wife to testify. We cannot say that these errors were harmless beyond a reasonable doubt, and we therefore reverse.
 

 At 1:34 p.m. on October 8, 1990 Echazabal was killed when he was shot in the upper right chest and lower left abdomen. Echazabal had been arguing with two Hispanic males in front of the 7-11 store at Fairfield and Boston streets in Las Vegas when one of the two males fired two shots into him. One of the men jumped into a red Ford pickup truck with a rear tailgate missing and backed it up, while the other ran to the passenger side. The two then fled in the truck. Police recovered two shell casings stamped “.32 Auto,” indicating that the gun used to kill Echaza-bal was an automatic.
 

 Between 1:30 and 1:40 that same afternoon Oscar Tovar (“Tovar”) heard a car pull up in front of his house at 4018 Edgewood Street, located within a mile of the 7-11. Through his open bathroom window, Tovar heard two doors slam and heard two excited male voices talking in Spanish. The men left the area and Tovar went outside, where he noticed a red pickup truck
 
 *1235
 
 parked in front of his house. Investigators located the truck at Tovar’s house, sealed it and towed it to the crime lab. Testimony showed that it had broken down after the battery had shifted and cut a hose, damage that was consistent with taking a turn onto the street at a high speed. The truck belonged to Valentino.
 

 At 1:55 p.m. Valentino reported the theft of his red Ford pickup. Officer Jeff Warner drove to Valentino’s apartment, where he saw Valentino, in a bathrobe, frantically waving him down. Valentino told Warner he had arrived home the previous evening after midnight, had stayed up with his wife until three in the morning, and had awakened the afternoon of the shooting at 1:00 p.m. Valentino said that he woke up and took a shower, and then noticed his car was missing, whereupon he reported the theft.
 

 Warner began a routine check of the car’s registration, at which time Valentino became nervous, started pacing back and forth and asked what was taking so long. Warner learned through the police computer that the vehicle might have been used in the shooting at the 7-11. Warner did not relay this to Valentino, but informed Valentino instead that a motor vehicle theft investigator was on the way. To this Valentino responded, “What did you say? Did you say my vehicle was involved in a murder or stuff?” When informed that Warner did not say that, Valentino responded, “Oh, I thought you said it was involved in some kind of stuff or something.”
 

 When homicide officers arrived, Valentino gave them permission to search the house. The officers noticed that the shower was “bone dry” and that there were no wet towels in the bathrooms. Lance Tharp, Ramon’s employer at Charlie’s Saloon, testified that he had seen Valentino with Ramon at 1:00 p.m. that day, and a neighbor of Ramon and Kim Franco’s testified that Kim told her that Valentino had been at Ramon’s house that morning.
 

 In addition to the above circumstantial evidence, the state produced five eyewitnesses who recounted substantially the same sequence of events as one another, but whose identifications of the two men they saw at the 7-11 were inconsistent and even contradictory. On appeal the state conceded that the eyewitness testimony at trial was “a wash.” Therefore, we do not review in detail the variations and contradictions of the several witnesses.
 

 The state also called Charles Helsel (“Helsel”), Ramon’s father-in-law, and Pauline Pitts (“Pitts”), Ramon’s sister-in-law. Helsel was allowed to testify that Kim Franco, Ramon’s wife and Helsel’s daughter, told her father that she believed Ramon had killed someone and that Valentino had done it with him. Helsel also testified that Ramon answered “si” when Helsel asked him if he wanted a lawyer, and after he asked Ramon, “How guilty are
 
 *1236
 
 you?” Kim was translating from English to Spanish during this conversation and it is unclear if the “si” was in response to “How guilty are you?” or “Do you want a lawyer?” Pitts was allowed to testify that Kim told her that Kim believed Ramon and Valentino had killed someone.
 

 The state also called Kim’s neighbor, Debra Broetz, who testified that Kim told her on the day of the shooting that she was afraid there was going to be trouble because Valentino had been at the house, was pacing back and forth, and Ramon was looking for the “clip” to his gun, and that the two brothers then left together.
 

 As motive the state relied upon the testimony of the victim’s wife, Nancy Echazabal, who testified that some ten months earlier, in December of 1989, Gilberto Echazabal had shot the appellants’ brother, Daniel Franco, in a dispute at Echazabal’s house. Although Daniel never told police who shot him, and neither did Ms. Echazabal, Valentino had allegedly told Ms. Echazabal that her husband, Echazabal, should not come around the hospital where Daniel was recuperating because . Ramon, he was real mad, he was real upset, he want to kill him.”
 

 Finally, the state also relied on a videotaped interview between Kim Franco and a police detective. In that interview Kim speculated that Ramon and Valentino had committed the murder and told the officer that Ramon had said “I was there, I was there.” Kim also repeated a statement allegedly made by Valentino, in which he said, “I don’t care. He tried to hurt somebody in my family,” in response to Kim’s question, “How could you?” In addition, Kim confirmed in the video that Ramon and Valentino were together on the morning of the murder and again immediately after the shooting, and that Charlotte Franco, Valentino’s wife, called to ask how one reports a car stolen. After deliberating for two days the jury returned verdicts finding each appellant guilty of first degree murder and not guilty of conspiracy to commit murder.
 

 The admission of the videotaped interview and other statements by Kim Franco are the most serious errors that occurred during appellants’ trial. We hold that the admission of these statements violated the hearsay rule and deprived appellants of their constitutional right to confront the witnesses against them.
 

 An out-of-court statement offered at trial to prove the truth of the matter asserted in the statement is hearsay, and is inadmissible unless it falls within one of the recognized exceptions to the hearsay exclusionary rule. NRS 51.035, 51.065. In addition, in a
 
 *1237
 
 criminal trial, the statement of a non-testifying hearsay declarant is only admissible under the Confrontation Clause
 
 [1]
 
 if it bears adequate “indicia of reliability.” Ohio v. Roberts, 448 U.S. 56, 66-67 (1980). Both hearsay and Confrontation Clause errors are subject to harmless error analysis.
 
 See
 
 Power v. State, 102 Nev. 381, 382, 724 P.2d 211, 213 (1986)
 
 (citing
 
 Chapman v. California, 386 U.S. 18 (1967)) (Confrontation Clause); Deutscher v. State, 95 Nev. 669, 683, 601 P.2d 407, 418 (1979) (hearsay).
 

 Kim’s hearsay statements, revealed through the videotape and through the testimony of Kim’s relatives, were not admissible under any traditional exception to the hearsay rule, and the record is devoid of facts that would warrant the admission of the statements under the general hearsay exception. The state argued that Kim’s statements were statements-against-interest.
 
 [2]
 
 This exception allows a hearsay statement to be admitted to prove the truth of the statement when the statement is so contrary to the speaker’s own interests that it can be assumed to be true.
 
 See
 
 2
 
 McCormick on Evidence
 
 § 318 (John W. Strong ed. 1992). In addition, the declarant must have had the opportunity to observe the facts so that she had personal knowledge of the matter.
 
 Id.; see also
 
 United States v. Lanci, 669 F.2d 391, 394-95 (6th Cir. 1982); United States v. Lang, 589 F.2d 92, 97-98 (2d Cir. 1978).
 

 The state argued that Kim’s admission that her husband was a murderer so tended to make her an object of hatred, ridicule or social disapproval that the statements, although they are only indirectly against her own interest, nevertheless fall within the social interest prong of the against-interest exception. The state is correct that Kim’s statements were admissible under this exception, if at all, only if the statements she made were in fact against
 
 *1238
 
 her “social interest.”
 
 [3]
 
 this is so because Kim did not expose herself to criminal or civil liability or say anything tending to harm her financial interests. We must therefore address the scope of the social interest exception.
 

 Nevada is among the few states that include social interests as a basis for admitting hearsay testimony in their against-interest exceptions. The drafters of the Federal Rules of Evidence removed this basis for admission because of the “possibly unmanageable nature of a ‘social interest’ exception.”
 
 See
 
 United States v. Dovico, 380 F.2d 325, 327 n.4 (2d Cir. 1967) (expressing concerns about identifying the “relevant community” and the motives of the declarant); Heddings v. Steele, 526 A.2d 349, 353 (Pa. 1987)
 
 (citing
 
 House Comm. on Judiciary, Fed. Rules of Evidence, H.R. Rep. No. 650, 93d Cong., 1st Sess. 16 (1973),
 
 reprinted in
 
 1974 U.S.C.C.A.N. 7075, 7089, for the proposition that the drafters relied on
 
 Dovico
 
 in rejecting the rule). We also note that very few states that have enacted the Uniform Rules of Evidence, submitted to the states by the National Conference of Commissioners on Uniform State Laws, have adopted the social interest basis proposed by the drafters of that Uniform Code.
 
 See
 
 Uniform Rules of Evidence, 13A U.L.A. 804(b)(3) (West 1986 & Supp. 1993) (only eight out of thirty-seven states adopting the proposed Uniform Rules retained the basis, while twenty-nine omitted it).
 

 The against-social-interest basis for admitting hearsay statements is, however, part of Nevada law. In light of the above authority questioning the workability of applying the basis, we elect to construe the basis narrowly. We hold that when the asserted justification for admission is that the statement is against one’s social interest the interest must not be too indirect or remote. The circumstances that would tend to subject one to hatred, ridicule or social disapproval must be such as to directly impugn the character of the declarant, not that of her husband. In the case at bar, it does not appear that Kim’s admitting that her husband may have killed someone was so much against her own social interest that we can assume that the statement is accurate. The statement does not appear to be the type of statement that would inspire hatred or ridicule in others. It is arguable that being married to a murderer tends to subject one to social disapproval, but this is not so clear. It may rather inspire pity or sympathy in the community. The statement holds Kim up to
 
 *1239
 
 social disapproval only through association with her husband; this is too remote of a connection for the admission of this type of statement. We therefore hold that the statements were not admissible under the statement-against-interest exception.
 

 Even if Kim’s statements were admissible as against her social interest, their admission in this case violated the rights of appellants to confront the witnesses against them. The Confrontation Clause limits the state’s ability to use hearsay as evidence in criminal trials when the hearsay declarant does not testify. The Clause requires that hearsay offered against an accused be sufficiently reliable to substitute for in-court scrutiny through cross-examination.
 
 [4]
 
 Hearsay statements are sufficiently reliable when they fall within a “firmly rooted” hearsay exception.
 
 See
 
 Wright v. Idaho, 497 U.S. 805, 815 (1989); Ohio v. Roberts, 448 U.S. 56, 66 (1980). If they do not fall within such an exception, they must be supported by a showing of “particularized guarantees of trustworthiness.”
 
 Id.
 

 The social interest basis of the statement-against-interest exception is not firmly rooted. The “firmly rooted” inquiry looks to how long the exception has been followed, and is informed by the number of federal and state courts that have adopted the exception in their rules of evidence.
 
 See
 
 White v. Illinois, 112 S.Ct. 736, 742 n.8 (1992). As shown above, not only is the social interest basis for admitting against-interest statements not widely adopted, it has been affirmatively rejected by most of the states that have considered it. In addition, Congress excluded it from the Federal Rules of Evidence. This part of the exception cannot be said to be firmly rooted. Thus, absent particularized guarantees of trustworthiness, admission of the statements was constitutional error. The record before us is devoid of any discussion or context that shows that the statements made by Kim to her family members and the detective bore the required guarantees of trust
 
 *1240
 
 worthiness. As a result, admission of the statements violated the appellants’ rights to confront the witnesses against them.
 

 Neither are Kim’s statements admissible under Nevada’s general exception.
 
 [5]
 
 There is nothing in the record to show that the state ever informed the judge of the circumstances surrounding the making of the various statements. The purpose of the general exception is to allow statements that do not fall within any traditional hearsay exception nevertheless to go before the jury when the circumstances are such that there are strong assurances of the accuracy of the statements. In the case at bar, there was absolutely no discussion of the surrounding circumstances, and it was not evident from the context of any testimony already in evidence that there were any special circumstances showing strong assurances of accuracy. We cannot uphold the admission of the testimony without evidence of record supporting a finding of trustworthiness. It was therefore error to admit Kim’s statements.
 

 In addition, general hearsay exceptions are not “firmly rooted” for the purposes of Confrontation Clause analysis.
 
 Wright,
 
 497 U.S. at 817. Therefore, hearsay statements of non-testifying declarant, even when properly admitted under the general exception, will violate the Confrontation Clause unless they also possess particularized guarantees of trustworthiness such that “adversarial testing would add little to their reliability.”
 
 Id.
 
 at 821.
 

 Again, there is no evidence in the record, and it is impossible to discern from the context of the other witnesses’ testimony, that guarantees of trustworthiness existed to render Kim’s hearsay statements particularly worthy of belief. The state’s failure to show affirmative reasons why Kim’s statements were particularly trustworthy therefore resulted in a violation of appellants’ rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.
 

 We cannot say that this hearsay and Confrontation Clause error was harmless beyond a reasonable doubt. There was very little physical evidence or eyewitness testimony placing Ramon at the
 
 *1241
 
 scene, and the eyewitness testimony placing him there was not altogether satisfactory. Kim’s repeated speculation to the detective and her family members was clearly damaging to the defense of appellants and we cannot say that the verdict would have been the same in the absence of the repeated references to Kim’s statements.
 
 [6]
 
 Likewise, the fact that Kim’s videotaped statement contained a statement directly attributed to Valentino renders his conviction suspect as well.
 

 Valentino also attacks the admission of Kim’s statement to her neighbor, Debra Broetz. Broetz testified that on the day of the murder, Kim called Broetz and told her that
 

 Valentino was over at the house and had been outside and was pacing back and forth. He came in, told [Kim] that something was wrong, or said something to Ramon, and then Ramon jumped up and then left. [Kim] said that she went to look for the clip of the gun and it was gone and she was scared there was going to be trouble.
 

 This statement could have been properly admitted under the “excited utterance” exception to the hearsay rule. That exception provides that, “A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition is not inadmissible under the hearsay rule.” NRS 51.095. Here, Kim appeared excited by the events and immediately called her neighbor. Kim told her she was scared, and related distressing events she had witnessed just moments before. Although this basis for admitting the statements was not argued to the judge, the statement could have been properly admitted under that exception. We therefore find that it was not error for the judge to have allowed Ms. Broetz to testify as she did.
 
 See
 
 Rosenstein v. Steele, 103 Nev. 571, 575, 747 P.2d 230, 233 (1987) (Supreme Court will atfirm correct result of trial court’s ruling even on different grounds).
 

 In addition, the excited utterance exception is firmly rooted.
 
 See
 
 United States v. Nick, 604 F.2d 1199 (9th Cir. 1979). Thus, the introduction did not violate the confrontation rights of appel
 
 *1242
 
 lants. Therefore, we find no constitutional error in the judge’s admission of this statement.
 

 Ramon also attacks the admission of a hearsay statement made by Valentino. Valentino allegedly told Echazabal’s wife, Nancy, that Echazabal should not go around the hospital where Daniel Franco was recuperating after being shot by Echazabal. Valentino allegedly told her that Ramon Franco “. . . was real mad, he was real upset, he want to kill him.” Statements of a party offered against that party at trial are not hearsay. NRS 51.015. Therefore, this statement made by Valentino to Ms. Echazabal was admissible against him. The state recognized this and argued that it was seeking to admit the statement against Valentino only. Although it was not particularly relevant against Valentino, no objection was interposed and the statement was ostensibly admitted against Valentino only.
 

 In closing, however, the state expressly used the statement against Ramon to show that Ramon had a motive. The state argued that “. . . Valentino Franco told [Nancy] it’s okay with me, but don’t have Gilberto ‘Shorty’ come around because it’s not okay with Ramon. The words were ‘Ramon will kill him.’ . . . There is motive in this case. These
 
 two people,
 
 as they sit here, have motive to do this murder.”
 

 Ramon asserts that the admission of this statement by Valentino violated his constitutional confrontation rights. His claim is based upon Bruton v. United States, 391 U.S. 123 (1967). Under
 
 Bruton,
 
 a defendant’s confrontation rights are violated when the state introduces a nontestifying co-defendant’s confession or statement incriminating the defendant.
 
 Id.
 
 at 137. The
 
 Bruton
 
 rule has not been extended, however, to apply to statements such as the one in this case, where the statement was made months before the crime and there is no danger that one of the defendants is attempting to shift blame to the other through his confession.
 
 See Bruton,
 
 351 U.S. at 135-36 (significant concern was motive to shift blame). Thus, the misuse of the statement by the prosecutor did not violate Ramon’s constitutional confrontation rights.
 

 Although we do not find the admission of the statement against Valentino to be prejudicial
 
 Bruton
 
 error, we do recognize that it was misconduct for the state to affirmatively misuse limited-admissibility testimony. Testimony inadmissible against one party or for one purpose may nonetheless be admissible against another party or for another purpose.
 
 See
 
 NRS 47.110; 1
 
 McCor
 
 
 *1243
 

 mick on Evidence
 
 § 59 (John W. Strong ed. 1992). The burden of seeking an admonishment or limiting instruction is normally on the party who fears that testimony admitted against another party may be used against him.
 
 See
 
 NRS 47.110 (“. . . the judge, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.”);
 
 see also McCormick
 
 at § 59 (“. . . the practice is to admit the evidence with an instruction, if requested, that the jury [shall] consider it only as to the party against whom it is admissible.”). In this case, Ramon failed to object at closing, and failed to seek an admonishment either when the evidence was offered or when the prosecutor misused it. In the absence of an objection at trial, Ramon is precluded from assigning error on appeal.
 
 See, e.g.,
 
 Riddle v. State, 96 Nev. 589, 591, 613 P.2d 1031, 1033 (1980). In addition, Ramon did not raise prosecu-torial misconduct on appeal; we discuss the issue only as it relates to Ramon’s asserted assignment of error under
 
 Bruton.
 

 We also note, however, another instance of prosecutorial misconduct. The state, when Kim asserted her privilege not to testify against Ramon, marked and introduced a photograph of Kim, who had been present in the courtroom in full view of the jury for several days. The photograph of Kim cannot be said to be relevant to any issue in the case, and appears to have been an indirect comment on the failure of the defendant’s wife to take the stand. We have reversed criminal convictions where the prosecutor commented on the defendant’s failure to call certain witnesses, and where the state commented upon a wife’s failure to take the stand either for or against her husband.
 
 See
 
 Hylton v. State, 100 Nev. 539, 541, 688 P.2d 304, 305 (1984); George v. State, 98 Nev. 196, 197-98, 644 P.2d 510, 511 (1982) (comment upon a claim of marital privilege is prohibited, and no inference may be drawn from the claim of a privilege);
 
 see also
 
 State v. Holsinger, 601 P.2d 1054, 1060 (Ariz. 1979). Although it was misconduct for the prosecutor to have engaged in this behavior, we need not reverse on this ground, as we have already found reversible error in admitting the hearsay statements made by Kim.
 

 Finally, we discuss the effect of the spousal privilege statutes upon this case, as there was considerable confusion in the record on this point. A spouse has a statutory privilege to refuse to take the stand when called to testify against his or her spouse. NRS 49.295(1)(a).
 
 [7]
 
 This privilege belongs to the testifying spouse and
 
 *1244
 
 in this case could only be waived by Kim if and when she took the stand. The district court held that Kim waived her testifying spouse privilege by engaging in the interview with the detective and by making the previously-discussed statements to her father and sister. This was incorrect, as the testifying spouse privilege is only waived by taking the stand at trial and testifying, which Kim refused to do.
 

 Ramon also enjoyed the privilege to prevent Kim from testifying regarding any statements made in reliance on marital confidence.
 
 See
 
 NRS 49.295(1)(b).
 
 [8]
 
 The statements in this case do not generally fall within that statutory privilege, however. Kim’s statements to her father and sister, and most of the statements Kim made in the interview, regarded her own beliefs. The only statement that Ramon could have prevented Kim from testifying to, if she had actually taken the stand, was Ramon’s own statement that “I was there. I was there.” Even then, Ramon would have to show that it was a statement made in reliance on marital confidence, and to Kim alone. Except for this one statement Ramon would not have had the privilege of preventing Kim’s testimony.
 

 Neither of these privileges, however, works to keep out a spouse’s hearsay statements offered at trial, including in this case Kim’s statement repeating Ramon’s inculpatory admission. The privileges discussed above enable a spouse to refuse to be examined against his or her spouse, and enable one spouse to prevent the other from being examined regarding statements made in reliance on marital confidence. The introduction of a spouse’s hearsay statements is not “testimony” or “examination,” however, and is not reached by the spousal privilege statutes.
 
 See
 
 Shults v. State, 96 Nev. 742, 746-47 & n.2, 616 P.2d 388, 391-92 & n.2 (1980) (when a spouse has not taken the stand at trial, she has not been “examined” within the meaning of the privilege statutes); United States v. Archer, 733 F.2d 354, 358-59 (1984) (privilege extends only to in-court testimony of testifying spouse, not to her out-of-court statements). Thus, the spousal privileges statutes were of no avail to Ramon in preventing the introduction of Kim’s hearsay statements.
 

 We have held, however, that Kim’s statements were not properly admitted hearsay, and that their introduction violated the appellants’ right to confront the witnesses against them. In addi
 
 *1245
 
 tion, the admission of these statements cannot be considered harmless error in light of the prejudicial nature of the statements and the conflicting nature of the other evidence.
 

 Given our disposition of the appeal on the above grounds, we do not reach appellants’ various other arguments.
 

 The judgments of conviction entered against appellants are reversed and these matters are remanded to the trial court for a new trial unless the state elects not to reprosecute the charges against appellants.
 

 [1]
 

 The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him . . . .” The requirements of the federal clause are made applicable to the states through the Fourteenth Amendment to the United States Constitution. Pointer v. State, 380 U.S. 400, 403-05 (1965).
 

 [2]
 

 The statement against interest exception, NRS 51.345, provides for the admissibility of
 

 [a] statement which at the time of its making: (a) Was so far contrary to the declarant’s pecuniary or proprietary interest; (b) So far tended to subject him to civil or criminal liability; (c) So far tended to render invalid a claim by him against another; or (d) So far tended to make him an object of hatred, ridicule or social disapproval, that a reasonable man in his position would not have made the statement unless he believed it to be true ....
 

 [3]
 

 We use the term “social interest” to refer to the interest one has in avoiding being made “an object of ridicule, hatred or social disapproval,” as provided in NRS 51.345.
 

 [4]
 

 When the proffered hearsay statement is the declarant’s former sworn testimony the Confrontation Clause generally requires unavailability.
 
 See
 
 United States v. Inadi, 475 U.S. 387, 392-94 (1986); White v. Illinois, 112 S.Ct. 736, 741 (1992). Assuming, arguendo, that the statement against interest and general exceptions might require unavailability, the state satisfied any such requirement, as it made “good faith efforts . . . prior to trial to locate and present [the] witness.”
 
 Roberts,
 
 448 U.S. at 74. Kim asserted her statutory privilege not to testify against Ramon, and the state could not compel her testimony. Although unavailability within the meaning of the hearsay exception is not necessarily identical to unavailability for purposes of the Confrontation Clause, we hold here that the state made the “good faith” efforts required by the state in seeking to produce the declarant.
 

 [5]
 

 The general exception, NRS 51.315, provides that “[a] statement is not excluded by the hearsay rule if. . . [i]ts nature and the
 
 special circumstances
 
 under which it was made offer
 
 strong assurances of accuracy
 
 . . . .” (Emphasis added.)
 

 [6]
 

 The state repeatedly introduced the suspect statements. First, the prosecutor played the videotape and introduced the transcript into evidence. Then, when Kim refused to take the stand, the prosecutor showed a picture to the jury of Kim, who had been present at the trial in full view of the jury for several days. Then the prosecutor elicited statements from Kim’s father and sister that Kim had told them that she thought Ramon had killed somebody and that Valentino had done it with him. All of this was incorrect and all these items of evidence were inadmissible.
 

 [7]
 

 NRS 49.295(l)(a) provides, “A husband cannot be examined as a witness for or against his wife without his consent, nor a wife for or against her husband without her consent.”
 

 [8]
 

 NRS 49.295(1)(b) provides that, “Neither a husband nor a wife can be examined, during the marriage or afterwards, without the consent of the other, as to any communication made by one to the other during marriage.”