131 Nev., Advance Opinion 49

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

| | |
|---|---|
| NOEL LIRIO GONZALES,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 64539<br><br>**FILED**<br><br>JUL 02 2015<br><br>TRACIE K. LINDEMAN<br>CLERK OF SUPREME COURT<br>BY S. Young<br>DEPUTY CLERK |

Appeal from a judgment of conviction, pursuant to a jury verdict, of conspiracy to commit robbery, burglary while in possession of a firearm, robbery with the use of a deadly weapon, and first-degree kidnapping with the use of a deadly weapon. Eighth Judicial District Court, Clark County; Douglas W. Herndon, Judge.

Affirmed.

Wright Stanish & Winckler and Monti Levy, Las Vegas,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and Megan Thomson, Deputy District Attorney, Clark County,
for Respondent.

BEFORE GIBBONS, C.J., TAO and SILVER, JJ.

*OPINION*

By the Court, TAO, J.:

Appellant Noel Gonzales was convicted of multiple felonies following a jury trial, and part of the evidence introduced against him was

15-900710

his tape-recorded confession to the crimes during a custodial police interrogation. Because Gonzales claims to be a non-native English speaker, he asks us in this appeal to adopt the test set forth by the United States Court of Appeals for the Ninth Circuit in *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998), to find that his confession should not have been admitted at trial because he was not provided with the assistance of an interpreter and therefore his confession was obtained illegally.

We conclude that the test set forth in *Garibay* provides a helpful guide in identifying and weighing some of the circumstances that may be relevant to the admissibility of confessions rendered by non-native English speakers. However, we decline to adopt the *Garibay* test as an overarching inquiry that must always be applied by district courts whenever an interrogated suspect is a non-native English speaker. After reviewing the totality of the circumstances in this case, we conclude that the district court did not err in ruling that appellant's confession was admissible even though English is not his native language and he was not provided with the assistance of an interpreter during his police interrogation. We also conclude that the district court did not err in admitting documents proffered to tie Gonzales to the scene that Gonzales characterizes as hearsay. In addition, we conclude the evidence presented to the jury in this case was sufficient to sustain convictions for the crimes of kidnapping and robbery arising from the same course of conduct.

*FACTS*

Michelle Damaya was in the garage of her home vacuuming her car while her 22-month-old daughter Abigail napped inside the house. Three people, a woman and two men, entered through the open garage door and accosted Michelle. The shorter of the two men, later identified as

Gonzales, was wearing a mask and had the hood of his sweatshirt pulled over his head so that Michelle could not immediately see his face. Gonzales pointed a gun at Michelle and told her, "we want your guns, we want your money." The woman motioned for Michelle to go inside the house, and she complied.

At gunpoint, Michelle led the trio to the master bedroom, where they ransacked the room in search of valuables. The trio asked Michelle where any guns and money were kept, but Michelle answered that she did not know because her husband had recently moved his guns in order to prevent Abigail from accidentally finding them. The woman responded by calling Michelle stupid for not knowing where anything was. Eventually, after searching the entire room, the perpetrators found a safe and forced Michelle to open it. The perpetrators then forced Michelle to hold laundry baskets for them to fill with items from the safe.

Michelle asked if she could go get Abigail, but the perpetrators refused. Following repeated and increasingly insistent requests by Michelle, Gonzales eventually gave permission and Michelle retrieved her daughter. At some point Gonzales and the female perpetrator split up to search other rooms of the house while the taller man stayed in the master bedroom with Michelle and Abigail. The taller man continued searching the master bedroom and eventually discovered a hidden firearm owned by Michelle's husband.

After a few minutes, the woman called Michelle to another room, where Michelle watched her go through the drawers of a desk. Michelle asked the taller man why they were there, and he replied that they had been hired to "come get your guns and money." The trio then scattered throughout the house in search of more valuables, leaving

Michelle and Abigail alone. Michelle ran to a side door that she had previously left unlocked, but apparently had been locked by the perpetrators during the crime, unlocked it, and fled the house with Abigail to a neighbor's residence where she called 9-1-1. Police officers arrived moments later and quickly located the woman and the taller man who had accompanied Gonzales. They also found a car parked in Michelle's driveway in which documents bearing Gonzales' name were later discovered.

While police officers worked to establish a perimeter around the house, Gonzales voluntarily approached a police detective parked on the street and spontaneously uttered, in English, "I was involved. It was me. I was involved." He was immediately arrested and searched, and property belonging to Michelle and her husband was found on his person. After the search, Gonzales asked, again in English, to be placed into the police car rather than be left standing in the street, and officers complied. Gonzales remained seated in the police car for approximately one hour with one back door open and the air conditioner turned on while the police continued to investigate the scene.

Gonzales was then transported to police headquarters and interrogated by Detective Patrick Flynn. Prior to the interrogation, Detective Flynn administered warnings, in English, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In English, Gonzales stated that he understood his rights and agreed to be questioned. Flynn repeated the warnings again, in slightly different and less formal language, later during the questioning. Gonzales, whose native language is Tagalog, never requested the assistance of an interpreter, and none was provided.

The entire interrogation was conducted in English and tape-recorded. Gonzales subsequently confessed to the offenses in detail in English.

Gonzales and his two codefendants were each charged with the crimes of conspiracy to commit robbery, burglary while in possession of a firearm, robbery with use of a deadly weapon, and first-degree kidnapping with use of a deadly weapon.

Prior to trial, Gonzales filed a motion with the district court seeking to suppress incriminatory statements made during his recorded interrogation, asserting that he was under the influence of methamphetamine during the interrogation, and furthermore that he had not been provided with the assistance of a Tagalog interpreter even though English was not his native language. Following a two-day evidentiary hearing, the district court denied the motion. The recorded interrogation was played to the jury during Gonzales' trial, and he was convicted of all counts. This appeal followed.

## ANALYSIS

In this appeal, we focus upon three contentions of error asserted by Gonzales.[1] First, Gonzales contends the district court erred by admitting statements made during his recorded interrogation because those statements were not made freely or voluntarily. Second, he asserts the district court erred in admitting hearsay in the form of a rental car agreement and a Money Tree receipt bearing Gonzales' name found in a

---

[1]Gonzales also contends that the multiple alleged errors constituted cumulative error depriving him of a fair trial. Because we conclude that the district court did not commit any of the individual errors ascribed to it, we also conclude that no cumulative error has occurred. *See Pascua v. State,* 122 Nev. 1001, 1008 n.16, 145 P.3d 1031, 1035 n.16 (2006).

(O) 1947B

car parked in the driveway of the home. Third, Gonzales avers the evidence was insufficient to support convictions for both kidnapping and robbery, because those counts legally "merged" under the facts of this case.

*Admission of Gonzales' incriminatory statements*

Gonzales first contends that incriminatory statements made by him during his recorded interrogation should not have been admitted at trial because his grasp of the English language was insufficient for him to knowingly and intelligently waive his *Miranda* rights, and because the circumstances demonstrate that the interrogation was coercive as he was not provided with the assistance of an interpreter. Therefore, Gonzales contends his confession should have been deemed inadmissible under the standard set forth in *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998).

When a confession is challenged and a hearing is requested under *Jackson v. Denno*, 378 U.S. 368, 380 (1964), the State must prove by a preponderance of the evidence that the defendant's incriminatory statements are admissible. *Dewey v. State*, 123 Nev. 483, 492, 169 P.3d 1149, 1154 (2007). When a defendant has been subjected to "custodial interrogation," the State must first demonstrate the police administered *Miranda* warnings prior to initiating any questioning. *See State v. Taylor*, 114 Nev. 1071, 1081, 968 P.2d 315, 323 (1998). If the warnings were properly given, the State must then prove the defendant voluntarily, knowingly, and intelligently understood his constitutional right to remain silent and/or to have an attorney present during any questioning, and agreed to waive those rights. *See Mendoza v. State*, 122 Nev. 267, 276, 130 P.3d 176, 181-82 (2006); *see also Miranda v. Arizona*, 384 U.S. 436 (1966). Even where such warnings were properly administered and waived, the State must also separately show that the defendant's incriminatory

statements were voluntary under the totality of the circumstances. *See Falcon v. State*, 110 Nev. 530, 534, 874 P.2d 772, 775 (1994).

"'A confession is admissible as evidence only if it is made freely, voluntarily, and without compulsion or inducement.'" *Echavarria v. State*, 108 Nev. 734, 742, 839 P.2d 589, 595 (1992) (quoting *Franklin v. State*, 96 Nev. 417, 421, 610 P.2d 732, 734 (1980)); *see also Passama v. State*, 103 Nev. 212, 213-14, 735 P.2d 321, 322 (1987) ("In order to be voluntary, a confession must be the product of a rational intellect and a free will." (internal quotation marks omitted)). Voluntariness must be determined by reviewing the totality of the circumstances, including such factors as the defendant's age, education, and intelligence; his knowledge of his rights; the length of his detention; the nature of the questioning; and the physical conditions under which the interrogation was conducted. *Passama*, 103 Nev. at 214, 735 P.2d at 323. A "confession is involuntary if it was coerced by physical intimidation or psychological pressure." *Brust v. State*, 108 Nev. 872, 874, 839 P.2d 1300, 1301 (1992). The ultimate inquiry is whether the defendant's will was overborne by the government's actions. *Chambers v. State*, 113 Nev. 974, 981, 944 P.2d 805, 809 (1997).

In this case, the parties do not dispute that Gonzales was in custody at all times while being questioned, that the police questioning constituted an "interrogation" triggering the administering of *Miranda* warnings, or that detectives administered the proper warnings prior to commencing the interrogation. Indeed, all of this is confirmed by the recording and transcript of the questioning. The parties also do not appear to dispute that Gonzales verbally acknowledged he understood his rights once they were read by saying "yes," and waived those rights to

participate in the police interrogation by answering questions without invoking his right to remain silent or asking for an attorney.

Gonzales contends, however, that his statements were inadmissible because he was not provided with the assistance of a Tagalog interpreter while being questioned, and also because he was intoxicated during the interrogation.[2] Consequently, Gonzales contends his *Miranda* waiver was inadequate and the entire interrogation was unconstitutionally conducted.

## The test of United States v. Garibay

Questions relating to the admissibility of a confession rendered by a non-native English speaker during a custodial police interrogation are ones that the courts of this state are encountering with increasing frequency. During a single shift, a police officer in Nevada may

---

[2]As a general proposition, intoxication is a factor the district court must consider in determining whether a confession was truly voluntary. However, intoxication is not, by itself, sufficient to render a confession involuntary when the totality of the circumstances otherwise indicate that the statements were voluntary. *E.g., Chambers v. State*, 113 Nev. 974, 981-82, 944 P.2d 805, 809-10 (1997) (confession voluntary even when given with blood alcohol content (BAC) of .27 and other drugs were present in defendant's system, and defendant was in pain from an open stab wound in arm); *Kirksey v. State*, 112 Nev. 980, 992, 923 P.2d 1102, 1110 (1996) (to render confession involuntary, defendant must have been so intoxicated that "he was unable to understand the meaning of his comments" (internal quotation marks omitted)); *Falcon v. State*, 110 Nev. 530, 533-35, 874 P.2d 772, 774-75 (1994) (confession admitted even though defendant was under influence of illegal narcotics at time of questioning); *Tucker v. State*, 92 Nev. 486, 487-88, 553 P.2d 951, 952 (1976) (confession admissible even though defendant's BAC was .20 at the time he signed the confession); *Wallace v. State*, 84 Nev. 603, 605, 447 P.2d 30, 31 (1968) (confession voluntary even when given in emergency room after being shot).

encounter a variety of different languages and dialects, and court-certified interpreters may not always be readily available to assist the officer whenever an interrogation is necessary. At the same time, there appears to be a dearth of published precedent from the Nevada Supreme Court to guide trial courts and police officers in handling such interrogations.

To fill that void, Gonzales asks this court to require district courts to apply the six-prong test set forth in *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998), whenever the admissibility of a custodial police interrogation of a non-native English speaker is challenged. In *Garibay*, the Ninth Circuit canvassed existing case law and identified six factors that federal courts generally consider relevant to the voluntariness of a confession rendered by a non-native English speaking defendant. Specifically, the court stated:

> In applying the "totality of circumstances" test, we further examine whether other circumstances surrounding Garibay's interrogation indicate that he knowingly and intelligently waived his constitutional rights, despite his English-language difficulties, borderline retarded IQ, and poor verbal comprehension skills. The following considerations guide our inquiry: (1) whether the defendant signed a written waiver; (2) whether the defendant was advised of his rights in his native tongue; (3) whether the defendant appeared to understand his rights; (4) whether a defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system.

*Id.* at 538. Factually, the Ninth Circuit held that Garibay's confession was involuntary because he possessed a low IQ, had some history of mental illness, and spoke English very poorly, yet was not provided with the

assistance of an interpreter during a custodial interrogation. *Id.* at 538-39. Because the interrogation of Garibay failed to meet even a single one of the six factors identified by the Ninth Circuit, the confession was deemed inadmissible. *Id.*

Gonzales asks this Court to follow the guidance of *Garibay* in determining the voluntariness of his confession in this case. As a general proposition, Nevada's Due Process Clause is textually identical to the federal Due Process Clause in relevant respects. *Compare* Nev. Const. art. 1, § 8(5), *with* U.S. Const. amend. XIV, § 1. The Nevada Supreme Court reads the state clause as coextensive with the federal clause. *See, e.g., Wyman v. State*, 125 Nev. 592, 600, 217 P.3d 572, 578 (2009). Furthermore, "Nevada has historically followed the United States Supreme Court on most, if not all, of its interpretations and applications of the law governing searches and seizures." *State v. Lloyd*, 129 Nev. ___, ___, 312 P.3d 467, 471 (2013) (internal quotation marks omitted). Thus, *Garibay* represents persuasive authority that can be considered by this court.

Contrary to Gonzales' characterization, however, *Garibay* did not articulate a comprehensive legal test that, by itself, determines the admissibility of any confession made by a non-native English speaker. Constitutionally, admissibility must be assessed in view of the "totality of the circumstances." *Passama*, 103 Nev. at 214, 735 P.2d 323. *Garibay* identifies some of the myriad circumstances generally relevant to the admissibility of any confession within the existing constitutional framework that might have special relevance when the defendant is a non-native speaker, but the factors listed therein are nonexclusive. 143 F.3d at 538 (stating that the factors listed were "considerations [to] guide our

inquiry"). Thus, the framework of *Garibay* may provide helpful guidance to district courts grappling with the question of admissibility of such confessions, and the *Garibay* factors may be considered by district courts when reviewing those confessions. However, the mere fact that a particular confession fails to satisfy the six factors identified in *Garibay* does not, by itself, render the confession inadmissible any more than an otherwise involuntary confession becomes admissible merely because it meets those six factors.

Questions relating to the admissibility of confessions by non-native English speakers are far too complex and fact-specific to pigeonhole into any single legal test, even one with six elements. Indeed, no single legal litmus test can possibly capture all of the relevant variations and iterations that could help determine the voluntariness of an interrogated suspect who speaks English as a second language, because non-native speakers who are somewhat familiar with English may possess different degrees of fluency that are not always easy to label or categorize. For example, some non-native English speakers may speak English conversationally yet not understand arcane or complex legal terms; some may speak English well but cannot read it; some may read and write English extremely well yet speak with accents that render their spoken words difficult for others to understand; some may understand the meaning of English words when they hear them without being able to generate those same words quickly during conversation; some may speak and understand English well when conversing with some people but have difficulty understanding others who speak with a strong regional accent such as a southern drawl or northeastern inflection; and some may understand extremely complex English words and concepts when formally

phrased yet not understand street jargon, slang, aphorisms, pop-culture references, or other colloquialisms that, to native speakers, might be far more conceptually simple. It is even possible that some non-native speakers may, based upon their education, understand the legal system extremely well yet not understand other words or concepts that might be conceptually simpler to others.

All of these subtleties are relevant to the voluntariness of a confession, but nonetheless are not captured well in the *Garibay* test. Consequently, while *Garibay* provides useful guidance for district courts grappling with the admissibility of confessions rendered by non-native English speakers, we decline the invitation to adopt the *Garibay* test as a comprehensive test of voluntariness in Nevada. The constitutional test for admissibility remains whether the confession was voluntary under the totality of all circumstances relevant to the confession, whether the circumstances are delineated in *Garibay* or not. *See Passama*, 103 Nev. at 214, 735 P.2d at 323.

Consequently, we cannot conclude that the district court erred in this case merely because it failed to set forth its findings within the context of the *Garibay* analysis.

*Admissibility of Gonzales' confession*

The district court conducted a two-day evidentiary hearing pursuant to *Jackson v. Denno*, 378 U.S. 368, 380 (1964), and concluded that Gonzales' statements were admissible. We review the district court's factual findings for "clear error" and its legal conclusions de novo. *Lamb v. State*, 127 Nev. 26, 31, 251 P.3d 700, 703 (2011). "On appeal, if substantial evidence supports the district court's finding that the confession was voluntary, then the district court did not err in admitting the confession." *Brust v. State*, 108 Nev. 872, 874, 839 P.2d 1300, 1301

(1992). "Substantial evidence" has been defined as evidence that "a reasonable mind might consider adequate to support a conclusion." *Steese v. State*, 114 Nev. 479, 488, 960 P.2d 321, 328 (1998). Additionally, even if the admission of a confession is deemed to have been erroneous, reversal is not required if the error was harmless. *Mendoza v. State*, 122 Nev. 267, 277 n.28, 130 P.3d 176, 182 n.28 (2006).

In this case, the district court concluded that Gonzales' ability to speak and understand English was sufficiently high that he was fully capable of understanding and waiving his *Miranda* rights and making free and voluntary admissions. During the two-day evidentiary hearing, certified court interpreter Josefina Dooley testified that Tagalog speakers who can appear to speak English well may have trouble understanding complicated legal principles such as *Miranda* warnings, and there are words contained within the standard *Miranda* warnings (such as "waiver") that cannot be easily translated directly into Tagalog. Ms. Dooley also testified that she had interpreted for Gonzales on approximately ten occasions and had witnessed him respond to questions inappropriately or incorrectly on a number of occasions. However, Ms. Dooley admitted she had also witnessed Gonzales begin to correctly answer questions posed to him in English before they were translated to him by her.

Two psychologists, Dr. John Paglini and Dr. Gary Lenkeit, were asked to conduct competency evaluations of Gonzales, and testified that Gonzales needed translation assistance during their evaluations. Dr. Paglini testified that Gonzales appeared to have good English comprehension skills, was "pretty fluent" in English, and had a higher-than-average IQ. Dr. Paglini described Gonzales as being able to respond in English approximately 30 to 50 percent of the time during the

evaluation and that approximately 50 to 70 percent of the time Gonzales could respond in English but would depend upon the interpreter to translate the questions for him before answering. Dr. Lenkeit testified that during his evaluation Gonzales relied upon the interpreter approximately 40 percent of the time, and appeared to particularly need translation assistance when asked questions relating to the legal system or to legal principles. Both Dr. Paglini and Dr. Lenkeit testified they could not have completed Gonzales' assessment without the assistance of a Tagalog interpreter. Dr. Lenkeit also opined that, had Gonzales ingested methamphetamine hours before the interview, the drugs would have further impaired his already-limited understanding of the interview in English.

A police detective testified that he interacted with Gonzales at the scene of the crime and, based upon his training and experience, Gonzales did not appear to be intoxicated or under the influence of narcotics. He also testified that while Gonzales spoke with an accent, he conversed freely in English and spontaneously admitted his involvement in the crime in English before being arrested. Two other police detectives testified that although Gonzales spoke with a pronounced accent, he was able to speak and understand most or all of what was said to him in English. They testified that Gonzales claimed during the interview to have ingested methamphetamine at approximately 10 o'clock the morning of the crime. The interrogation occurred at 7:32 that evening, some nine hours later.

Another police officer testified that he had previously arrested Gonzales for an unrelated offense and had administered *Miranda* warnings in English that Gonzales acknowledged understanding. He also

testified that Gonzales spoke with a heavy accent and occasionally gave answers that were difficult to understand or unintelligible, but Gonzales was able to answer most questions posed to him in proper English.

After hearing this testimony, the district court concluded that Gonzales "presented insufficient evidence that he was under the influence of a narcotic that would render his statement involuntary." Our review of the record reveals the only evidence presented by Gonzales of any drug use was his own claim to have ingested methamphetamine more than nine hours prior to the interrogation. No witness testified that Gonzales appeared to be intoxicated during the interrogation, and no medical evidence of drug usage was presented to the district court. Under these circumstances, the district court's conclusion was not clearly erroneous.

The district court also concluded that Gonzales understood and spoke English sufficiently well that his incriminatory statements were free and voluntary and he could understand and thereby waive his *Miranda* rights even without the assistance of an interpreter. In reviewing the record, we note the district court was presented with evidence suggesting that Gonzales' grasp of the English language was limited and he had difficulty understanding legal concepts in English. The transcript of his interrogation includes certain confused descriptions, such as describing criminals as "the felonies people."

On the other hand, the evidence before the district court also suggested that Gonzales understood most of what was said to him during the interrogation. Indeed, Gonzales concedes in his appeal briefing that he "appears [to observers] to be fluent in conversational English." The transcript of the interrogation further indicates Gonzales understood virtually every question asked of him, his answers were on the whole

clear, appropriate, and responsive to the questions asked, and he even occasionally corrected erroneous information presented to him. Some of his answers consisted of lengthy narratives in English that included complex words and concepts such as "diversified," "camouflage," "informant," "prescription," and "discharging firearms." Additionally, Gonzales was described as having a higher-than-average IQ and was familiar with the *Miranda* warnings from at least one previous police interrogation. At one point during the interrogation, the following colloquy occurred:

> Gonzales: Man it's in my heart to help, you know, but the problem is the English the problem—that's my problem.
>
> Detective Flynn: Yeah I think your English is pretty good. There's only been a couple—couple times when I had a hard time understanding you but you just explained it a different way. I understand everything you are saying.
>
> Gonzales: But . . .
>
> Detective Flynn: Do you understand everything I'm saying?
>
> Gonzales: Yes sir.
>
> Detective Flynn: Okay. You've never had a problem understanding what I'm saying?
>
> Gonzales: No you're clear.

The district court also indicated it had listened to audio recordings of the interrogation and two phone calls made by Gonzales while incarcerated. Importantly, the court noted that witnesses Josefina Dooley, Dr. Paglini, and Dr. Lenkeit had not been provided with either the videotape of Gonzales' interrogation or audio recordings of Gonzales' phone calls that the court reviewed. After considering all of the evidence, the district court concluded Gonzales "has sufficient skills in English to

Court of Appeals
of
Nevada

(O) 1947B

not only understand the *Miranda* warnings, but to waive his rights and make a statement against interest."

In this case, the district court was presented with conflicting evidence. While reasonable minds could perhaps reach different conclusions based upon that evidence, the district court heard the witnesses and saw the evidence firsthand while this court has only the written record. Based upon the evidence in the record, we cannot fairly say the district court's factual findings constituted clear error, and we conclude the district court did not err as a matter of law by admitting Gonzales' confession.[3]

Finally, we note that even if Gonzales' custodial confession was improperly admitted, the collective evidence against him was overwhelming. Police found Gonzales near the scene moments after the crime with some of the victim's stolen property in his pocket, and he immediately confessed to the crime (in a statement not challenged on appeal) before even being identified as a suspect or arrested. Thus, any error in admitting Gonzales' statement, even if such error occurred, would have been harmless.

---

[3]We also note Gonzales' confession in this case met three of the six factors set forth in *Garibay*. While Gonzales did not sign a written waiver and was not provided with the assistance of an interpreter, the detective took the time to explain the individual portions of the *Miranda* warnings in plain English several times during the interrogation, and each time Gonzales stated that he understood them. Furthermore, Gonzales had prior experience with the criminal justice system and had been administered *Miranda* warnings on at least one prior occasion. *See Garibay*, 132 F.3d at 538.

*Admission of alleged hearsay evidence*

Gonzales also contends the district court erred in admitting evidence in the form of photographs of documents found at the scene of the crime that, according to Gonzales, constituted hearsay.

Hearsay is defined as an out-of-court statement offered to prove the truth of the matter asserted. NRS 51.035. Hearsay is generally inadmissible unless it meets a recognized exception. NRS 51.065(1). Alleged hearsay errors are subject to harmless-error analysis. *Franco v. State*, 109 Nev. 1229, 1237, 866 P.2d 247, 252 (1993). The trial court is vested with broad discretion in determining the admissibility of evidence, and a decision to admit or exclude particular evidence will not be reversed absent a clear abuse of discretion. *Crowley v. State*, 120 Nev. 30, 34, 83 P.3d 282, 286 (2004).

In this case, the evidence in question consisted of photographs of a rental car agreement and a Money Tree receipt bearing Gonzales' name that police found in a car parked in Michelle's driveway. Michelle testified the car did not belong to her. The photographs were proffered by the State in order to connect the vehicle to Gonzales. The district court admitted the photographs of the documents over a timely objection by Gonzales, reasoning that they tied Gonzales to the car. Gonzales argues that this was error because the presence of his name on the documents constituted a hearsay statement "asserting" that Gonzales rented or drove the car, yet no witnesses were able to testify that the papers fell within the "business records" exception to the hearsay rule.

The question of whether the hearsay statute encompasses documents offered as circumstantial evidence linking a defendant to a particular person, place, or thing has not been specifically addressed by the Nevada Supreme Court. It has, however, been addressed by numerous

Court of Appeals
of
Nevada

(O) 1947B

federal courts, and the decisions of those courts constitute persuasive authority for this court. *Cf. Terry v. Sapphire Gentleman's Club*, 130 Nev. ___, ___, 336 P.3d 951, 957 (2014) ("having no substantive reason to break with the federal courts on this issue, judicial efficiency implores us to use the same test as the federal courts under the [Fair Labor Standards Act]." (internal quotation omitted)); *State v. Lloyd*, 129 Nev. ___, ___, 312 P.3d 467, 471 (2013) ("Nevada has historically followed the United States Supreme Court on most, if not all, of its interpretations and applications of the law governing searches and seizures." (internal quotation marks omitted)); *Exec. Mgmt., Ltd. v. Ticor Title Ins. Co.*, 118 Nev. 46, 53, 38 P.3d 872, 876 (2002) ("Federal cases interpreting the Federal Rules of Civil Procedure are strong persuasive authority, because the Nevada Rules of Civil Procedure are based in large part upon their federal counterparts." (internal quotation marks omitted)). This is especially so because Nevada's hearsay statute is virtually identical to the federal hearsay rule. *Compare* NRS 51.035, *with* Fed. R. Evid. 801(c).

"Many [federal] courts ... have held that merchandise receipts, utility bills, and similar documents are not hearsay when they are offered as circumstantial evidence to link a defendant to a particular place, to other defendants, or to an illegal item." *United States v. Serrano*, 434 F.3d 1003, 1005 (7th Cir. 2006); *United States v. Thornton*, 197 F.3d 241, 251 (7th Cir. 1999) (receipts, utility bills, and business cards were admissible to show the relationship of coconspirators to each other); *United States v. McIntyre*, 997 F.2d 687, 702-04 (10th Cir. 1993) (testimony regarding rental, money order, and credit card receipts was admissible to link defendants together and to certain locations); *United States v. Patrick*, 959 F.2d 991, 999-1000 (D.C. Cir. 1992) (television sales

receipt bearing defendant's name was admissible to link defendant to cocaine and a weapon found in the same bedroom, but it was not admissible to prove the defendant resided at the address listed on the receipt), *abrogated on other grounds by United States v. Webb*, 255 F.3d 890, 894-95 (D.C. Cir. 2001); *see also United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000) (finding the defendant "had a substantial connection to the house: in his bedroom were multiple medicine bottles labeled with his name as well as his clothes; he received his mail at [the house]; and he admitted that he was the caretaker and landlord of the address"); *United States v. Kitchen*, 57 F.3d 516, 520 (7th Cir. 1995) ("The search revealed, in addition to the firearms, a number of Kitchen's possessions—his El Rukn bracelet, bills and papers bearing his name and various articles of men's clothing.").

> In such cases, the documents are not introduced for the truth of the matters they assert—for example, that the defendant rented a car, bought a television, or used 500 kilowatt hours of electricity. Rather, the documents are introduced for the inferences that may be drawn circumstantially from their existence or from where they are found, regardless of whether the assertions contained therein are true or not . . . *See also* Fed. R. Evid. 801 Advisory Committee Notes to 1972 Proposed Rules (noting that the rule excludes from the definition of hearsay "verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted").

*Serrano*, 434 F.3d at 1005 (internal quotation marks omitted).

Thus, the weight of federal authority holds the admission of documents bearing a defendant's name in order to establish a circumstantial link to the defendant does not necessarily violate the

hearsay rule. We find this authority persuasive. Had the State sought to introduce the documents found in the car to prove that Gonzales actually rented a car or borrowed money from Money Tree, the documents may have constituted hearsay. But in this case, the State introduced the documents to link Gonzales to a vehicle found at the crime scene under circumstances in which it was unlikely that documents bearing his name would be left in the car by anyone other than Gonzales, regardless of whether it was true or not that he rented the car or ever patronized the Money Tree. What mattered was not the truth asserted within the documents, but rather the circumstances of their discovery. Thus, the photographs of those documents were not hearsay and the district court did not err in admitting them.

*Sufficiency of the evidence sustaining the convictions for kidnapping and robbery*

Gonzales contends the evidence in this case was insufficient to sustain convictions for both first-degree kidnapping with the use of a deadly weapon and robbery with use of a deadly weapon.

The test for sufficiency of the evidence in a criminal case is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[I]t is the jury's function . . . to assess the weight of the evidence and . . . credibility of witnesses." *Id.*

In this appeal, Gonzales does not challenge the sufficiency of the evidence supporting his individual convictions for robbery, burglary, or conspiracy. Instead, he challenges only the evidence underlying the first-degree kidnapping conviction, contending that the facts sustaining the

21

kidnapping conviction were intertwined with those proving the robbery conviction and therefore he cannot be convicted of both crimes.

The crime of robbery is articulated in NRS 200.380, while the crime of first-degree kidnapping is described in NRS 200.310(1). A conviction for first-degree kidnapping requires proof that a victim was seized or detained for one of certain specifically enumerated purposes, including (among other things) for the purpose of committing one of the listed predicate felonies such as sexual assault, extortion, robbery, or homicide. Dual convictions under both statutes are permitted based upon the same conduct. However, in such cases, the Nevada Supreme Court has held:

> to sustain convictions for both robbery and kidnapping arising from the same course of conduct, any movement or restraint must stand alone with independent significance from the act of robbery itself, create a risk of danger to the victim substantially exceeding that necessarily present in the crime of robbery, or involve movement, seizure or restraint substantially in excess of that necessary to its completion.

*Mendoza v. State*, 122 Nev. 267, 275, 130 P.3d 176, 181 (2006). In general, "[w]hether the movement of the victims is incidental to the associated offense and whether the risk of harm is substantially increased thereby are questions of fact to be determined by the trier of fact in all but the clearest cases." *Curtis D. v. State*, 98 Nev. 272, 274, 646 P.2d 547, 548 (1982).

The Nevada Supreme Court has held that moving a victim from one room inside a house to another room in search of valuables during the commission of a robbery is insufficient, by itself, to sustain convictions for both kidnapping and robbery. *See Wright v. State*, 94 Nev.

415, 417-18, 581 P.2d 443-44 (1978) (reversing kidnapping conviction as incidental to robbery when movement from room to room occurred "only for the short period of time necessary to consummate the robbery" for purposes of locating valuables). *Wright* is the principal authority relied upon by Gonzales in challenging his kidnapping conviction.

In this case, Michelle was accosted at gunpoint while in her garage with the door open and the interior visible to her neighbors, and then forced into the residence and moved from room to room. The jury could have found that, by moving Michelle from a public place into a private one, Gonzales substantially increased the risk of harm to Michelle, because had Michelle been detained in the open garage while her residence was ransacked, she might have been seen by passersby who could have called police, she might have had a chance to cry out to her neighbors for help, and she might even have found an easier opportunity to escape while her house was being searched room by room. But these opportunities were diminished once she was removed from public view. Furthermore, moving Michelle from the open garage into the secluded interior of the locked house, and then throughout the house, may have psychologically emboldened the defendant to escalate the violence of the crime, as well as to extend the length of time over which it took place, once Michelle's fate was less likely to be witnessed by her neighbors.

Gonzales nonetheless argues that he cannot be convicted of both kidnapping and robbery because Michelle was only moved into the house to help search for valuables during the robbery. Gonzales' argument touches upon one of the curiosities of the *Mendoza* doctrine, which fundamentally asks the jury to define the level of violence acceptably necessary to commit the crime of robbery. Gonzales contends

COURT OF APPEALS
OF
NEVADA

(O) 1947B

that Michelle's detention was inherent in, and necessary to, the robbery because she was only detained for as long as it took to ransack the house, and was only moved within the house for the purpose of aiding in the search for valuables. In essence, he avers that Michelle's movement cannot constitute a kidnapping because it was closely related, spatially and temporally, to the facts required to prove the elements of the crime of robbery.

Some cases contain language supporting Gonzales' argument. *See Wright*, 94 Nev. at 417-18, 581 P.2d at 443-44 (referring to the "short period of time" during which robbery occurred). However, casting the *Mendoza* test solely or primarily in relation to overlapping space and time raises logical problems. A robbery can take place over extended distance and time, including efforts to escape the scene after property has been taken. *See Fouquette v. State*, 67 Nev. 505, 527-28, 221 P.2d 404, 416-17 (1950). In this case, Michelle was detained for somewhat less than an hour while the criminals ransacked the house. But Gonzales' argument suggests that a victim could be detained for much longer, many hours or perhaps even days, without converting a robbery into a kidnapping so long as the criminals continue to leisurely search for valuables during the entire period. It also suggests that a victim could be physically transported over vast distances without being kidnapped, so long as the purpose of the transportation is to collect the victim's far-flung possessions. Thus, under Gonzales' theory, had Michelle owned a vacation home in Miami, transporting her thousands of miles from Las Vegas to Florida over a period of many days could conceivably be argued to have

been necessary to effectuate the taking of all of her possessions; but that argument is clearly not what *Mendoza* envisioned.[4]

In this case, Michelle was moved from the open garage into the house, and then from room to room, while the criminals ransacked the entire home. Gonzales argues that the movement was intended to assist him in locating valuables, but as it turned out, Michelle provided almost no help because she did not know where her husband had stored his weapons. Indeed, her assistance turned out to be so inconsequential that the criminals berated her for her ignorance. Yet, even after realizing she could provide little guidance to them, the perpetrators nonetheless continued moving her to different rooms for no ascertainable purpose. Under these facts, the jury could have found that the robbery could have been successfully completed by simply detaining Michelle in the garage while other accomplices searched through the residence for valuables without her, and Michelle was therefore unnecessarily forced at gunpoint into the house when she did not need to be for the robbery to occur and her concealment increased the danger to her and allowed the crime to continue unabated for much longer than it otherwise might have.

Under the circumstances of this case, the jury could reasonably have found that Michelle's movement substantially exceeded

---

[4]Conversely, it is also true that multiple crimes can occur within a very small window of time and space; here, Gonzales does not challenge the validity of his convictions for burglary and conspiracy based upon facts occurring in rapid succession and in close physical proximity to the facts underlying the robbery conviction. *See Garcia v. State*, 121 Nev. 327, 344, 113 P.3d 836, 847 (2005) (affirming convictions for kidnapping, robbery, and conspiracy based on events occurring close together in time and within the same room).

that necessary to complete the robbery and/or substantially increased the harm to her. Whether Michelle's movement was incidental to the robbery, and whether the risk of harm to her was substantially increased, are questions of fact to be determined by the jury in "all but the clearest of cases." *Curtis D.*, 98 Nev. at 274, 646 P.2d at 548. We conclude that this is not one of the "clearest" of cases in which the jury's verdict must be deemed unreasonable. We therefore conclude that the evidence presented to the jury was sufficient to convict Gonzales of both robbery and first-degree kidnapping.

## CONCLUSION

For the foregoing reasons, we conclude that the district court did not commit reversible error, and therefore affirm the judgment of conviction.

_____, J.
Tao

We concur:

_____, C.J.
Gibbons

_____, J.
Silver